1
2
3

Bardis Vakili, CA SBN 247783
Law Office of Bardis Vakili, P.C.
P.O. Box 234160
Encinitas, CA 92023
Tel: (619) 483-3490
bardis@vakililegal.com

4

*Counsel for Plaintiff Rosa Lopez and Minor V-S-*

5
6
7
8

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

9
10
11
12
13
14
15
16
17

| | |
|---|---|
| Rosa Lopez, as Legal Guardian of V-S-, a Minor and Successor in Interest to the Estate of Victor Sanchez Brito;<br><br>Plaintiffs,<br><br>v.<br><br>United States of America; GEO Group, Inc., a corporation,<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR DAMAGES**<br><br><br>DEMAND FOR JURY TRIAL AS TO THOSE CLAIMS SO TRIABLE |

18
19
20
21
22
23
24
25
26
27
28

COMPLAINT

**<u>INTRODUCTION</u>**

1.     Immigration agencies and their prison subcontractors have no authority to incarcerate United States citizens for civil immigration proceedings. They certainly may not subject a lifelong U.S. citizen with a serious mental illness to nearly seven years of such imprisonment, including several years in near-total isolation, because they neglected to look for and then chose to ignore evidence that he was born in the United States. This case is about immigration authorities' disregard for the limits of their authority under these principles, for the binding laws and policies that enforce them, and the devastating consequences that resulted for one young man.

2.     Plaintiff Rosa Lopez ("Ms. Lopez") brings this action under the Federal Tort Claims Act ("FTCA"), Rehabilitation Act, and California state laws to seek accountability for the shocking mistreatment of her son, a U.S.-born citizen, by agents of U.S. Immigration and Customs Enforcement ("ICE") and The GEO Group ("GEO").

3.     Victor Manuel Sanchez Brito ("Mr. Sanchez Brito" or "Victor") was a father to a young child, a son to a loving mother, and a brother to three siblings. He lived with schizoaffective disorder—bipolar type and a cognitive disability stemming from a traumatic childhood brain injury. Since the day he was born in his parents' trailer in Temecula, California in 1990, he was a United States citizen, like anyone else born in the United States. His U.S. citizenship had never been in question.

4.     But then, in 2015, ICE arrested Mr. Sanchez Brito after a cursory, illegal, and deficient investigation led the agency to jump to the incorrect conclusion he was not a U.S. citizen. Agents based this erroneous arrest on a delayed "registration" created in Mexico months after his birth under obviously suspicious circumstances. Among other things, the document stated on its face that Mr. Sanchez Brito's parents were not present at the registration, a plain red flag that ICE officials never noted or investigated. ICE also procured the document in violation of California laws meant to protect against unauthorized use of juvenile files.

5.     For nearly seven years, ICE officials steadfastly refused to release Mr. Sanchez Brito, even after he, his mother, and his immigration lawyer presented evidence that he was born

in the United States and that the delayed Mexican registration was fraudulently procured without his mother's knowledge by his paternal grandmother. In arresting him and subjecting him to years of confinement, ICE officials violated binding agency policies mandating release when presented with such evidence.

6.      First, ICE incarcerated Mr. Sanchez Brito in the Yuba County Jail ("Yuba Jail") for more than three years. Then, ICE transferred him to the Mesa Verde ICE Processing Center ("Mesa Verde"), operated by GEO, where Defendants imprisoned him for more than three additional years. During his confinement, Defendants subjected Mr. Sanchez Brito to inhumane treatment in conditions identical to or worse than those faced by people in pre-trial detention or serving criminal sentences, despite legal requirements that such supposedly "civil" immigration detention be non-punitive in nature.

7.      For the majority of his time in ICE custody at both Yuba Jail and Mesa Verde, Defendants subjected Mr. Sanchez Brito to prolonged periods of isolation in a tiny cell, often for many consecutive months at a time, where they denied him access to programs, recreation time, and socialization opportunities offered to others, and where staff verbally abused him for his mental illness. At the same time, Defendants also discontinued the medication that they knew had been helping Mr. Sanchez Brito successfully manage his mental illness for years, against the recommendations of medical staff. They instead imposed treatment they knew to be ineffective, simply because it was easier and/or cheaper. Defendants inflicted this abuse on Mr. Sanchez Brito on account of his disability, in violation of anti-discrimination laws and applicable detention standards.

8.      Unsurprisingly, Defendants' prolonged torment of Mr. Sanchez Brito took its toll. When he entered ICE custody, he was able to carry on conversations, understand his proceedings, and follow rules. By the time Defendants were done with him, he had suffered several psychotic breaks, often could not speak in coherent sentences, and had lost 30 pounds. The years-long degradation caused his physical and mental health to deteriorate so substantially that he never recovered. When ICE finally relented and released him – only after a federal district court unequivocally confirmed his U.S. citizenship and derided ICE's inadequate

investigation – Mr. Sanchez Brito was a broken man. Although he tried to recover from his seven-year nightmare with the support of his loving family, he was still suffering. He avoided social interaction with people who knew him. Often, he would sleep underneath his bed.

9.      Within months of his release, Mr. Sanchez Brito was found dead after an apparent drug overdose, in what his mother believes was a suicide. He was 32 years old.

## JURISDICTION AND VENUE

10.     **Jurisdiction**: This Court has jurisdiction over the present action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(b) (federal defendant), and 28 U.S.C. §§ 2674, 2680 (FTCA). This Court has supplemental jurisdiction over Plaintiff's California state law claims pursuant to 28 U.S.C. § 1367.

11.     **Venue**: Venue is proper in this district pursuant to 28 U.S.C. § 1391 (general venue) and 28 U.S.C § 1402(b) (FTCA venue) because (1) this is a civil action that includes a claim under the FTCA in which a defendant is the United States of America, (2) Plaintiff resides in Marin County, California in this judicial district, (3) a substantial part of the conduct, events, acts, and omissions giving rise to the claims occurred in the ICE San Francisco Field Office, in the immigration court in San Francisco, California, and in Marin and Contra Costa Counties, all of which are located in this judicial district, and (4) Defendant GEO is subject to this Court's personal jurisdiction.

12.     **Divisional Assignment**: This case may be assigned to the San Francisco Division because this case is not one of the enumerated types of cases in Civil Local Rule 3-2(c), because Plaintiff resides in Marin County, and because a substantial part of the conduct, events, acts, and omissions giving rise to the claims occurred in Contra Costa and San Francisco Counties. *See* Civil L.R. 3-2(c), (d).

## PARTIES

13.     Plaintiff Rosa Lopez is Mr. Sanchez Brito's mother and the court appointed legal guardian of V-S-, a minor and Mr. Sanchez Brito's son. She brings this action on behalf of V-S- in her capacity as his legal guardian. At all times relevant to this complaint, Ms. Lopez has been an individual domiciled in Marin County, California. V-S- is eleven years old and the only child

of Mr. Sanchez Brito. *See* Ex. A, Decl. of Rosa Lopez. At the time of Mr. Sanchez Brito's death, Mr. Sanchez Brito was unmarried. *Id*. Therefore, V-S- is Mr. Sanchez Brito's sole successor in interest. Because V-S- is a minor and Ms. Lopez is his court-appointed legal guardian, Ms. Lopez is a proper plaintiff in this case pursuant Fed. R. Civ. P. 17. *Id*.

14.     Defendant United States of America is a proper defendant under the FTCA. 28 U.S.C. § 1346(b). The United States is sued for the injuries and harm to Mr. Sanchez Brito caused by the wrongful acts or omissions of its employees, as well as its contractors that ICE supervised and for whom ICE bore responsibility for ensuring contractual and legal compliance. At all times from April 25, 2015 until December 10, 2021, Mr. Sanchez Brito was in ICE's continuous custody. All federal officers referenced in the complaint were at all relevant times acting within the scope and course of their employment when they caused harm to Mr. Sanchez Brito. All ICE officers who caused harm to Mr. Sanchez Brito were authorized to execute searches, seize evidence, or make arrests for violations of federal immigration laws, or were otherwise acting as federal investigative or law enforcement officers as defined by the FTCA.

15.     Defendant GEO is a multinational private prison corporation, headquartered in Boca Raton, Florida, which operates jail and prison facilities in the State of California. GEO contracts with Defendant ICE to operate several facilities in ICE's immigration detention program, including Mesa Verde in Bakersfield, California, and the Golden State Annex in McFarland, California. GEO has substantial contacts within the geographical range of the Northern District of California, including that it operates Mesa Verde and the Golden State Annex under the oversight and supervision of the ICE San Francisco Field Office.

## FTCA EXHAUSTION

16.     The FTCA has an exhaustion requirement under which a claimant, before filing suit, must tender an administrative tort claim to the relevant federal agency. If the agency does not finally dispose of the administrative claim within six months, then the claimant is deemed to have exhausted administrative remedies. 28 U.S.C. § 2675(a). On November 29, 2022, Ms. Lopez and V-S- submitted through counsel, via email and certified mail, an administrative tort claim on FTCA Standard Form 95, on their own behalf and as Mr. Sanchez Brito's successors in

1  interest. Among other things, they alleged the United States was liable for false imprisonment,

2  abusive conditions of confinement, emotional distress, pain, suffering, and death inflicted on Mr.

3  Sanchez Brito, as well as loss of familial relationship inflicted on themselves and Mr. Sanchez

4  Brito.

5      17.    On February 8, 2023, ICE sent a letter acknowledging receipt of the Standard

6  Form 95 submissions by Ms. Lopez and V-S-, which the agency states it received on December

7  15, 2022. To date, ICE has sent no further communication and has not rendered a decision on

8  their claims.

9              **BACKGROUND REGARDING ICE DETENTION**

10     **A.  ICE Detention Program**

11     18.    ICE is an executive agency of the United States responsible for immigration

12  enforcement. It operates a vast detention program that imprisons tens of thousands of individuals

13  every day – none of whom are serving time for a crime – for civil immigration proceedings.

14     19.    "ICE contracts out its detention responsibilities to (1) private contractors" such as

15  Defendant GEO, "who run facilities owned either by the contractor or the federal government,

16  and (2) local, state, or other federal agencies," such as Yuba County. *Geo Grp., Inc. v. Newsom*,

17  50 F.4th 745, 751 (9th Cir. 2022). These responsibilities include the provision of programming,

18  discipline, protection, transportation, and medical care for people in ICE custody, consistent with

19  the applicable version of the ICE Performance Based National Detention Standards ("PBNDS")

20  referenced in their contracts. All individuals in the physical custody of ICE's detention

21  contractors are in the physical and legal custody of ICE.

22     20.    Because immigration detention is nominally "civil" in nature, conditions of

23  confinement may not amount to punishment. *See Youngberg v. Romeo*, 457 U.S. 307, 321-322

24  (1982). When conditions of so-called civil confinement are "identical to, similar to, or more

25  restrictive than" criminal pre-trial custody, they are presumptively punitive. *Jones v. Blanas*, 393

26  F.3d 918, 932 (9th Cir. 2004).

27

28

COMPLAINT
5

**B. ICE Policies Regarding Detention of Individuals with Claims to U.S. Citizenship**

21.     Under the Non-Detention Act, "[n]o citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a). Although Congress has authorized ICE to take custody of non-citizens for immigration removal proceedings (*see* 8 U.S.C. §§ 1225(b), 1226(a), (c)), it has not authorized ICE to arrest or imprison U.S. citizens for such proceedings, nor could it. *See Flores-Torres v. Mukasey*, 548 F.3d 708, 710 (9th Cir. 2008) ("There is no dispute that if Torres is a citizen the government has no authority under the [Immigration and Nationality Act] to detain him, as well as no interest in doing so, and that his detention would be unlawful under the Constitution and under the Non–Detention Act[.]").

22.     Thus, if the agency wishes to challenge a U.S. citizen's claim to citizenship, it is free to do so, but it must pursue such a challenge without detaining the person. For instance, the *non*-detained docket of immigration court, which ICE utilizes in hundreds of thousands of removal cases, is one potential venue for such a challenge.

Directive 16001.1

23.     ICE's written policy for the detention of individuals with claims to U.S. citizenship at the time of Mr. Sanchez Brito's initial arrest was established by ICE Directive 16001.1, issued on Nov. 19. 2009 and intended to "ensure claims to U.S. citizenship receive immediate and careful investigation and analysis."

24.     Under Directive 16001.1, if there exists "some probative evidence that the individual is a USC [United States citizen], officers and agents should consult with" attorneys for ICE "as soon as practicable." If probative evidence of U.S. citizenship outweighs probative evidence to the contrary, ICE may not take the person into custody, though it can initiate and pursue removal proceedings on the non-detained docket of immigration court.

25.     Directive 16001.1 was likely unlawful because it impermissibly permitted imprisonment even if ICE could not sustain its well-established burden to prove deportability by "clear, unequivocal, and convincing evidence," including proving that an alleged non-citizen is, in fact, a non-citizen. *See Woodby v. Immigr. & Naturalization Serv.*, 385 U.S. 276, 286 (1966).

It instead impermissibly placed the burden for release instead on the person claiming U.S. citizenship to prove that citizenship by a preponderance of evidence. An executive agency cannot give itself authority that it does not lawfully possess.

Directive 16001.2

26.     Regardless of the legality of Directive 16001.1, it was superseded just a few months into Mr. Sanchez Brito's imprisonment in ICE custody. On November 10, 2015, ICE issued Directive 16001.2, which replaced Directive 16001.1. Directive 16001.2 remained binding policy for the remainder of Mr. Sanchez Brito's confinement.

27.     Under Directive 16001.2, "[i]t is ICE policy to carefully and expeditiously investigate and analyze the potential U.S. citizenship of individuals encountered by ICE." Directive 16001.2 requires ICE to handle citizenship matters with "the utmost care and highest priority" and to check any "reasonable means available to" the agency when encountering someone with a claim to U.S. citizenship.

28.     After completing an investigation, Directive 16001.2 requires agents to promptly prepare a memorandum for review by ICE Headquarters indicating whether the case falls into one of three categories: (1) the evidence "strongly suggests that the individual is a U.S. citizen" or the citizenship claim is "credible on its face;" (2) "[s]ome probative evidence indicates the individual may be a U.S. citizen but the evidence is inconclusive;" or (3) "[n]o probative evidence indicates the individual is a U.S. citizen." Directive 16001.2 broadly defines "probative evidence of U.S. citizenship" under the second category to mean merely some evidence "that the individual may, in fact, be a U.S. citizen." Per the Directive, not even a "preponderance of evidence" is necessary to qualify as "some probative evidence" under the second category. ICE Headquarters must make a decision on the memorandum's recommendation within one business day when the subject of the memorandum is detained.

29.     Directive 16001.2 forbids ICE from taking or keeping someone in custody for removal proceedings *unless* the person falls into the third category, meaning that *no* probative evidence indicates the individual is a U.S. citizen. Any person who falls into the first or second

categories (such as Mr. Sanchez Brito) and who was "already in ICE custody" (such as Mr. Sanchez Brito) "should be immediately released."

### C. ICE Policy Regarding Solitary Confinement and Segregation

30.     When an individual in ICE custody cannot be safely detained in the general population of a facility, ICE policy permits their detention in segregated units, sometimes called "Special Management Units" ("SMUs") or Restricted Housing Units ("RHUs"). ICE policy recognizes two forms of segregation: administrative and disciplinary segregation.

31.     Administrative segregation is permitted by ICE policy when the individual's continued presence in the general population poses a threat to life, property, self, staff, or other detainees; for the secure and orderly operation of the facility; or for medical reasons. According to ICE, administrative segregation is considered a non-punitive status and should be for the briefest term, under the least restrictive conditions practicable, and consistent with the rationale for placement.

32.     Disciplinary segregation is punitive and can only be authorized after a hearing by a disciplinary panel for a violation of facility rules.

Directive 11065.1

33.     On September 4, 2013, ICE issued Directive 11065.1, entitled "Review of the Use of Segregation of ICE Detainees." Directive 11065.1 states ICE policy that placing an individual in segregated housing "is a serious step that requires careful consideration of alternatives" and "should occur only when necessary and in compliance with applicable detention standards." "In particular, placement in administrative segregation due to a special vulnerability should be used only as a last resort and when no other viable housing options exist." When segregation is imposed "for over 14 days" on anyone, or "for any length of time" on an individual with "known special vulnerabilities" such as "mental illness," "ICE shall take additional steps to ensure appropriate review and oversight" of segregation decisions.

34.     Directive 11065.1 requires that individuals "in administrative segregation shall receive the same privileges as detainees housed in the general population, consistent with safety and security concerns."

35.     Directive 11065.1 requires notification and periodic review by an ICE Field Office Director for extended segregation placements or placements involving an individual with mental illness. Upon such review, the Field Office Director "shall… arrange for utilization of such less restrictive options that are appropriate and available," including "options to limit isolation, including additional out of cell time and the ability to participate in group activities." If consistent with legal, public safety, and immigration enforcement concerns, "release from custody" should be considered. Such reviews should be conducted at 30-day intervals, with written reports to ICE Headquarters. ICE Custody Management Division and ICE Health Service Corps also have responsibilities to review segregation cases involving people with mental illness.

## FACTUAL ALLEGATIONS

### A.  Mr. Sanchez Brito's United States Birth and Childhood

36.     In 1989, Ms. Lopez came to the United States with her daughter Elena, who was less than two-years-old. Ms. Lopez was only eighteen at the time, spoke no English, and lacked valid immigration documents. Her mother put them on a bus from their home in Morelos, Mexico, to Tijuana, Mexico, where they met up with Victor Sanchez Carrillo ("Mr. Carrillo"), Elena's father. Mr. Carrillo had already been living in the U.S., and he brought them by foot back across the border into the United States.

37.     Mr. Carrillo lived and worked on a ranch in Temecula, California and had arranged for them to all live in a trailer on the ranch in exchange for work. Ms. Lopez worked in the stables. Mr. Carrillo was extremely abusive and violent, and he controlled all aspects of Ms. Lopez's life. At first, he did not permit her to leave the ranch for any reason, allowing her only to work and return to the trailer. When Ms. Lopez was pregnant with Mr. Sanchez Brito, Mr. Carrillo did not allow her to go see a doctor.

38.      Baby Victor was born on April 1, 1990, in the trailer on the ranch where his parents worked and lived. There was no doctor present, but Mr. Carrillo brought someone named Nancy, who Ms. Lopez had never met, to help Ms. Lopez give birth.

39.     Because Ms. Lopez was not allowed to leave the ranch, she did not register Mr. Sanchez Brito's birth in the United States or obtain a birth certificate.

40.     Home births are not uncommon in general, in Mexican farm-working families more specifically, or in Ms. Lopez's own family even more specifically. Ms. Lopez herself was born at home, and three of her four children were not born in a hospital.

41.     After Victor, Ms. Lopez had two more sons with Mr. Carrillo: Raul was born in 1991, and Roberto was born in 1992. Mr. Carrillo had not wanted another child. After Raul was born, he threatened that if she got pregnant again, he would kill her and the baby. With his history of violence against them, Ms. Lopez believed the threats were real, so she hid her pregnancy with Roberto by wearing baggy clothing.

42.     In or around 2001, when he was about ten or eleven years old, Victor was admitted to the Children's Hospital in San Diego California after suffering a serious head injury. Although he had done well in school prior to the incident, his academic and cognitive function declined afterward, and he became prone to having seizures.

43.     Victor started having symptoms of mental illness around the age of 13 or 14, and he was soon diagnosed with schizophrenia, bipolar type. Victor began to struggle behaviorally. He had run-ins with the law that resulted in juvenile court proceedings and involvement with Riverside Probation Department. As a result, he spent many years living in a group home.

44.     Eventually, Ms. Lopez fled with Roberto from Mr. Carrillo, because she feared for their lives based on his continued violence and threats against them. She moved to the San Francisco area and stayed in a shelter for victims of domestic violence. Eventually, Victor and his other siblings joined her in the Bay Area.

45.     Ms. Lopez never thought about whether her children's births were registered, because there was never any reason. Victor was involved with government social workers, the Riverside Probation Department, and the juvenile court system. He went to school and received benefits and medical care through Medi-Cal with his valid social security number, which he had had since his childhood. Ms. Lopez believes it was obtained with the help of a social worker. Nobody had ever questioned his U.S. citizenship to her.

46.     In 2010, Ms. Lopez applied for a U visa, which is available to victims of violent crime who help in the investigation of their abusers. As part of the application, U visa applicants

may request and obtain legal immigration status for their minor children who do not otherwise have it. In the application, she truthfully listed Victor and his brothers as U.S.-born citizens, and she listed Elena as born in Mexico.

47.     In 2011, V-S- was born. Mr. Sanchez Brito was not married to the mother of V-S-, and they did not remain together as a couple. Neither Ms. Lopez nor V-S- know her current whereabouts. Thereafter, Ms. Lopez became the legal guardian of V-S-.

48.     As an adult, Mr. Sanchez Brito continued to have run-ins with the law. He was convicted of various crimes over the years, though he never received a sentence longer than one year. He served time in Marin County Jail various times, but ICE never took custody of him as a non-citizen or challenged his citizenship prior to arresting him in 2015, even though ICE had agents stationed in the jail.

### B.     2015 ICE Arrest of Mr. Sanchez Brito

49.     On or about April 25, 2015, Mr. Sanchez Brito was scheduled to be released to his home after completing a criminal sentence in the Marin County Jail. Unfortunately, he would not return home that day as any other U.S. citizen would have. Instead, ICE Officer Marco Grasso encountered Mr. Sanchez Brito. Officer Grasso was stationed at Marin County Jail as a member of the "Criminal Alien Program" for the purpose of identifying immigrants in the jail who may be subject to removal from the United States.

50.     Officer Grasso had access to the jail's booking system, which listed Mr. Sanchez Brito as a U.S. citizen. Officer Grasso was aware based on the booking records that, throughout Mr. Sanchez Brito's interactions with law enforcement during his life, Mr. Sanchez Brito had repeatedly informed law enforcement officers that his place of birth was the United States. However, according to Officer Grasso, the booking records also had other entries listing him as born in Mexico. Officer Grasso interviewed Mr. Sanchez Brito, who told him he was born in California. Officer Grasso did not believe him.

51.     Officer Grasso had obtained a delayed Mexican birth registration regarding Mr. Sanchez Brito that he assumed established Mr. Sanchez Brito was born in Mexico. But the

delayed registration had significant and obvious defects on its face that undermined its reliability as proof of Mexican birth.

52.     Most notably, the delayed registration was not made by either of Mr. Sanchez Brito's parents, but by his paternal grandmother. The document on its face clearly states that neither the mother nor the father appeared or were present to register Mr. Sanchez Brito, and that his paternal grandmother is the one who registered the birth.

53.     In addition, the document was created more than three months after Mr. Sanchez Brito's actual birth. United States officials regularly challenge the U.S. citizenship of people with similarly delayed United States birth certificates, but Agent Grasso and ICE credited this delayed Mexican birth registration without question.

54.     Other aspects of the document that render it suspect could have been uncovered with minimal investigation. For instance, it listed Mr. Sanchez Brito's maternal grandmother but omitted her true first name, "Aurelia," and listed her residence as Coyocotla, Mexico, a place she never actually lived. It also listed supposed "witnesses" who Mr. Sanchez Brito's mother had never met or known. And the signature purportedly belonging to Ms. Lopez is not her signature, a fact she could have easily confirmed if asked (and that was later conclusively established in immigration court). A simple phone call from Officer Grasso to Ms. Lopez would have confirmed these significant discrepancies, which would raise serious questions about the document's provenance and reliability to any reasonable person. Inexplicably, and despite Directive 16001.1's requirement of a thorough investigation, Officer Grasso did not even attempt to contact Ms. Lopez.

55.     Indeed, Officer Grasso did not even speak or read Spanish well enough to understand the defects in the Spanish-language document. He later admitted under oath that he did not understand or pay any attention to the portion of it that stated Mr. Sanchez Brito's parents were not present for his registration in Mexico. Despite his admittedly flawed Spanish, he did not request or obtain an English translation of the delayed registration.

56.     Nor did Officer Grasso show the document to Mr. Sanchez Brito or his mother to ask them about it. Neither Mr. Sanchez Brito nor his mother Ms. Lopez recalled ever seeing the delayed registration prior to his removal proceedings.

57.     Officer Grasso also appears to have originally accessed the delayed registration in violation of California law. Officer Grasso first became aware of it by directly accessing Mr. Sanchez Brito's juvenile file from the Riverside County Probation Department, which was involved in some of Mr. Sanchez Brito's juvenile delinquency matters. However, Mr. Sanchez Brito's juvenile file and all documents in it, including the delayed registration, were presumptively confidential under California law. With a few inapplicable exceptions, the contents of a juvenile file in California cannot be inspected or shared without juvenile court approval, which must be obtained by filing a petition with the juvenile court. *See* Cal. Welf. and Inst. Code § 827; Cal. R. Court 5.552. Even those authorized to have the document, like the Riverside Probation Department or a school, cannot disseminate portions of a juvenile case file without juvenile court approval. *Id*. However, rather than follow California legal requirements, Officer Grasso instead contacted the Marin County Office of Education, which he was aware had obtained a copy of the record from the Riverside Probation Department, and he obtained it directly from them. Officer Grasso later stated he had no idea who provided the Mexican record to the Marin County Office of Education and could only speculate as to that fact.

58.     Despite being aware of Mr. Brito's lifelong claims of United States birth, and despite not being able to adequately read or translate the Mexican delayed registration, Officer Grasso did not conduct any further investigation at that time. He interviewed Mr. Sanchez Brito only once. He never even attempted to contact Ms. Lopez, who obviously was a witness to Mr. Sanchez Brito's birth, because he considered the matter a "shut" case. He did not attempt to access Ms. Lopez's immigration file, to which he had ready access, which would have revealed the prior U-visa application in which she stated that Mr. Sanchez Brito was born in the United States but that her oldest daughter Elena was not. These were facts about which she had no motivation to lie at the time, which any reasonable officer would have realized: if Mr. Sanchez Brito was actually born outside the U.S., she could have listed him as such to obtain legal status

for him as she had done for Elena; and if she was going to lie, she would have listed Elena as also born in the U.S.

59.     As a result of his perfunctory and inadequate investigation, Officer Grasso decided ICE should arrest Mr. Sanchez Brito as a non-citizen and imprison him without bond for removal proceedings. ICE took him into custody at the Contra Costa County Jail that same day, April 25, 2015.

60.     Officer Grasso failed to follow Directive 16001.1 in Mr. Sanchez Brito's case. Among other things, he did not immediately conduct a meaningful, careful, or lawful investigation into Mr. Sanchez Brito's citizenship, did not consult with ICE attorneys before requiring his imprisonment, and ordered his imprisonment based on alleged evidence of foreign birth that he did not actually understand and that was insufficiently probative regarding Mr. Sanchez Brito's actual place of birth.

### C. 2015-2018: ICE Imprisonment of Mr. Sanchez Brito at Yuba Jail and Immigration Proceedings

61.     On or about April 27, 2015, ICE transferred Mr. Sanchez Brito to the Yuba Jail. Yuba County contracted with ICE to imprison ICE detainees in the Yuba Jail. On information and belief, ICE had officers on-site every day at Yuba Jail. ICE was responsible for the supervision of Yuba Jail's ICE detention operations, as well as ensuring Yuba Jail's operational compliance with ICE detention standards and contractual duties.

62.     Based on his criminal history and his alleged Mexican citizenship, ICE deemed Mr. Sanchez Brito to be subject to the so-called mandatory detention provisions of the INA, 8 U.S.C. § 1226(c).

63.     On or about April 28, 2015, medical staff at Yuba Jail, performing medical services for ICE detainees pursuant to the ICE contract, conducted an initial medical assessment and noted in Mr. Sanchez Brito's file that he had been diagnosed with schizophrenia.

64.     On or about May 3, 2015, ICE referred Mr. Sanchez Brito to a psychiatrist for a psychiatric evaluation. The psychiatrist noted Mr. Sanchez Brito had been receiving regular

injections of Invega Sustenna to successfully manage his symptoms for roughly three years prior to entering ICE custody. The psychiatrist ordered the Invega treatment to continue.

65.     At the May 3 psychiatric evaluation, Mr. Sanchez Brito informed the psychiatrist that he had his first immigration court hearing the next day, and that he hoped to be released back home at that time.

66.     On May 4, 2015, Mr. Sanchez Brito had his first immigration court hearing. He was represented by counsel, who informed the immigration judge ("IJ") and ICE counsel that Mr. Sanchez Brito had a significant mental illness.

67.     On or about May 18, 2015, the ICE Health Service Corps, described on ICE's website as "the only entity within ICE responsible for providing essential health care for all noncitizens detained in ICE custody,"[1] conducted a mental health review of Mr. Sanchez Brito. The doctor noted that Mr. Sanchez Brito reported having had auditory hallucinations since he was eighteen years old. Mr. Sanchez Brito also reported that his Invega Sustenna injections always helped him feel stabilized, even while in custody. The doctor noted that his appearance, behavior, and thought processes were appropriate and that his attitude was respectful.

68.     Despite the May 3 note that the Invega injections should continue, as well as doctors' awareness that it worked well for Mr. Sanchez Brito for years, during the course of his incarceration at Yuba Jail and Mesa Verde, this treatment was not provided because it was not "covered" by ICE. By fall of 2015, medical staff instead began treating Mr. Sanchez Brito's mental illness with Seroquel and Risperidone. Throughout his imprisonment, Mr. Sanchez Brito repeatedly informed facility staff that these were not effective.

69.     On June 29, 2015, Mr. Sanchez Brito had another immigration court hearing. His mother testified under oath that she gave birth to him at their home in Temecula, with only Mr. Castillo and his friend Nancy present, and that she never registered his birth. She was shown the delayed Mexican registration for the first time in her life. She testified that she had never seen it before that day, that the signature purporting to be hers was not hers, and that she had never

---

[1] *ICE Health Service Corps*, https://www.ice.gov/detain/ice-health-service-corps (last checked August 9, 2023).

known anyone by the names of the witnesses to the registration that were listed in the document. Other defects, like the fact that neither of Mr. Sanchez Brito's parents was present for the registration, were also discussed in court. Despite this probative testimony, ICE continued to imprison Mr. Sanchez Brito.

70.     On July 14, 2015, another hearing was held, and Ms. Lopez testified again. She explained that her husband Mr. Carrillo was abusive and threatened to take the children away from her to Mexico. She also testified that he had told her he wanted to register the children in Mexico so that they would not have any problems if he ever brought them back. Meanwhile, ICE could not produce a witness from the Mexican government to authenticate the delayed registration or explain its defects. At the end of that hearing, the IJ pointed out that the Mexican birth registration was "clearly" an "orchestrated event." Nevertheless, ICE continued to keep Mr. Sanchez Brito imprisoned.

71.     Other immigration court hearings were held over the next few months. During this period, a "long form" version of the delayed Mexican registration was produced, which was different from the original one relied upon by ICE. This one had many of the same defects as the one that had previously been produced, though it had no signature. During this same period, Mr. Sanchez Brito's lawyer requested production of the memo required by Directive 16001.1 and later by Directive 16001.2. ICE refused to produce it, claiming privilege.

72.     On November 10, 2015, ICE issued Directive 16001.2, discussed above, requiring that people currently in ICE custody for whom there was at least "some probative evidence" of U.S. citizenship must be immediately released. Despite this mandatory requirement, ICE continued to imprison Mr. Sanchez Brito. That same day in immigration court, ICE produced a summary of a memo regarding Mr. Sanchez Brito's citizenship, but refused to produce the memo itself, claiming it was privileged. On information and belief, the memorandum that was summarized did not comply with the requirements of Directives 16001.1 or 160012.

73.     At an immigration hearing on December 15, 2015, ICE counsel admitted the agency had no witnesses to call to corroborate its assertion that Mr. Sanchez Brito was born in Mexico, relying only on the fact that the orchestrated, delayed Mexican registration was an

official document. Mr. Sanchez Brito's attorney presented the testimony of a handwriting expert, who testified that the signature on the document purporting to belong to Ms. Lopez was not her signature. Still, ICE continued to imprison Mr. Sanchez Brito.

74.     At a February 29, 2016 hearing, ICE cross-examined the hand-writing expert, after which the IJ noted that the expert's testimony that the signature on the delayed Mexican registration did not belong to Ms. Lopez was convincing. Nevertheless, ICE continued to imprison Mr. Sanchez Brito.

75.     On January 30, 2017, the IJ ordered Mr. Sanchez Brito removed, though he found Ms. Lopez's signature on the delayed Mexican registration was falsified. The Board of Immigration Appeal upheld the IJ's order on July 14, 2017. Mr. Sanchez Brito timely petitioned for review to the Ninth Circuit.

76.     On December 19, 2017, pursuant to 8 U.S.C. § 1252(b)(5)(B), the Ninth Circuit issued an order transferring Mr. Sanchez Brito's petition for review to the district court for de novo review of his citizenship claim, stating "We find that a genuine issue of material fact exists as to petitioner's claim of United States citizenship." Order, *Sanchez Brito v. Sessions*, No. 17-72066 (9th Cir. Dec. 19, 2017), ECF No. 12. A genuine issue of material fact could not exist unless there was "some probative evidence" of U.S. citizenship, as defined by Directive 16001.2. Nevertheless, ICE kept Mr. Sanchez Brito imprisoned in violation of that Directive.

77.     While his immigration proceedings were playing out over these years, Mr. Sanchez Brito was suffering greatly in custody. By the winter of 2016, it became clear that his mental health was deteriorating and that his treatment was not effective. He began refusing to take his Risperidone, which he informed staff was not working. He got caught with contraband a few times, including marijuana and Suboxone, which he almost certainly used as a form of self-medication to help manage his symptoms. By February 2016, medical staff noted that Mr. Sanchez Brito had become dysphoric, confused, and "grossly disorganized." His attorney expressed concern to the IJ and in March 2016 requested another hearing to re-determine his competency. In April 2016, Mr. Sanchez Brito bit through his tongue. He repeatedly stated that he was desperate to get out of custody.

78.     During his incarceration at Yuba Jail, Mr. Sanchez spent significant durations of time in solitary confinement. Indeed, on information and belief, the majority of his imprisonment at Yuba Jail was spent in administrative segregation, where he was confined to his cell 22 to 23 hours a day. While in the segregated unit, he was given limited access to programming, yard time, and other benefits available to people in the general population.

79.     Even when Mr. Sanchez Brito was in the general population, the conditions were harsh. On information and belief, immigration prisoners at Yuba Jail were mixed in with and subjected to similar conditions as people in criminal custody. On information and belief, the conditions were similar to those depicted in the photos below, which are true and correct copies of photographs filed in another case before this Court as true and correct copies of photographs of the living units at Yuba Jail taken in 2015. *See* Decl. of Sean Riordan, ¶¶ 3, 5, *Zepeda Rivas v. Jennings*, Case No. 3:20-cv-02731, (N.D. Cal. Apr. 20, 2020), ECF No. 5-6.







80.     Indeed, the conditions for individuals in ICE custody at Yuba Jail were widely known to be harsh. On October 21, 2021, twenty-four members of Congress sent a letter to Secretary of Homeland Security Alejandro Mayorkas, urging him to end contracts at three ICE detention centers in California, including Yuba Jail. The congressional letter stated, "Those detained ay Yuba have experienced a lack of medical care, broken hygiene facilities, unsanitary conditions including mold and insects, spoiled food, and excessive use of solitary confinement, leading to repeat protests and hunger strikes, when formal complaints were mishandled," in

addition to retaliation by guards against detained individuals.[2] As noted in the congressional letter, "the ICE Office of Detention Oversight's most recent inspection of Yuba revealed 31 deficiencies and found that it was in compliance with only half of the 18 ICE detention standards."[3]

81.     The congressional letter echoed concerns raised by advocates. An administrative complaint filed with the DHS Office of Civil Rights and Civil Liberties noted a 2018 "hunger strike to protest inadequate medical care; the unjustified failure to provide access to programs and religious services; and lack of working toilets and lights," as well as retaliation and assault by guards against hunger striking individuals.[4] The complaint also cited to ongoing court monitoring of the facility that found "persistent delays in providing medical and mental health care" and "inadequate medical and mental health staffing generally."[5]

82.     On information and belief, Mr. Sanchez Brito was confined in conditions similar to or worse than those depicted in the photographs above and described in the congressional letter and administrative complaint.

83.     Ultimately, his mistreatment and prolonged incarceration and isolation led to an apparent psychotic break: in or around April 2018, Mr. Sanchez Brito was suffering so greatly that he had to be hospitalized in an in-patient facility due to his deteriorating mental health.

### D.     2018-2021: ICE Imprisonment in Mesa Verde and District Court Citizenship Proceedings

84.     On or around July 4, 2018, ICE transferred Mr. Sanchez Brito from Yuba Jail to Mesa Verde, operated by Defendant GEO pursuant to a contract with ICE.

---

[2] Congressional Letter to DHS Secretary Alejandro Mayorkas (Oct. 21, 2021), available at https://lofgren.house.gov/sites/evo-subsites/lofgren-evo.house.gov/files/CA%20ICE%20Detention%20Letter.pdf.
[3] Id.
[4] Cal. Collab. for Immigrant Justice, Centro Legal de la Raza, and ACLU California Affiliates, Administrative Complaint, "First Amendment Retaliation Against Individuals in Immigration Detention in California," (Aug. 26, 2021), available at https://www.aclunc.org/sites/default/files/OCRCL%20complaint.08.26.21%20_0.pdf.
[5] Id.

*Conditions at Mesa Verde*

85.     On information and belief, ICE stationed officers on-site every day at Mesa Verde and was responsible for the supervision and oversight of GEO's detention operations there, including ensuring GEO's compliance with ICE detention standards and contractual duties. GEO at times subcontracted its medical duties under its ICE contract, but GEO still bore ultimate non-delegable responsibility for those duties, and GEO did or should have recognized that its subcontractors' performance of those duties was likely to create a particular risk of physical harm in the absence of special precautions, which GEO did not take.

86.     Pursuant to its contract with ICE, Defendant GEO receives compensation for every day each incarcerated individual spends in its Mesa Verde facility. As a result, the corporation has a financial incentive to keep individuals in its custody longer and not to advocate for the release of anyone in its custody.

87.     People in the general population at Mesa Verde are subjected to harsh conditions by Defendants. The general population area of the jail is made up of four housing units with fifty bunk beds in each, cramming 100 "civil" detainees together in extremely tight quarters. They are locked up behind razor wire and cell walls in a secured facility that they are forbidden from leaving, where Defendants (a) force them to wear color-coded prisoner jump suits, (b) dictate the nature of their medical treatment, (c) decree when meals are given and what meals would be provided, (d) mandate when lights go on and off, (e) forbid them from accessing the internet, (f) prevent them from having contact visits with family and loved ones, (g) restrict access to outdoor spaces, (h) determine what educational programming might be offered, if any, (i) prevent them from working for fair wages while charging them for any amenity not deemed necessary, including phone calls, and (j) guard them at all times with armed guards authorized to inflict punishment for violations of rules, including through the imposition of solitary confinement. These conditions were in place during Mr. Sanchez Brito's imprisonment.

88.     On information and belief, the conditions faced by Mr. Sanchez Brito while in general population were similar to those depicted in the photos below, which are true and correct copies of photographs filed in another case before this Court as true and correct copies of photographs of the general population living units at Mesa Verde that had been published by the media. Decl. of Sean Riordan, ¶ 7, Ex. F, *Zepeda Rivas v. Jennings*, Case No. 3:20-cv-02731 (N.D. Cal. Apr. 20, 2020), ECF No. 5-6:







89.     Advocates and individuals inside Mesa Verde routinely protest the harsh conditions there, including spoiled food, mold, mishandling of the COVID-19 pandemic, abusive and retaliatory treatment, unsafe and exploitive labor conditions, and inadequate medical care. The California Department of Justice found that two months after California declared a state of emergency due to COVID-19, while Mr. Sanchez Brito was there, GEO was still refusing to test individuals imprisoned at Mesa Verde for COVID-19 because they had no room to quarantine people who tested positive.[6] These issues have sparked hunger strikes and several lawsuits by individuals confined in Mesa Verde in recent months and years. These conditions were in place during Mr. Sanchez Brito's imprisonment at Mesa Verde.

*Defendants' Treatment of Mr. Sanchez Brito at Mesa Verde*

90.     Mr. Sanchez Brito deteriorated further while imprisoned at Mesa Verde. He was originally housed in general population, but by September 2018 Defendants had already placed him in administrative segregation in the "RHU" – the term for Mesa Verde's segregated (or restricted) housing unit – for an alleged safety concern. He spent a substantial amount of the next three years in a cramped cell in administrative segregation. Defendants' stated reasons for his placement in the RHU would vary: "for his own protection from other detainees," he was "acting

---

[6] California Department of Justice, *Review of Immigration Detention in California* at 138-39 (Jan. 2021), available at https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/immigration-detention-2021.pdf.

out" in the dorms, "safety concern," "custody protection," "disciplinary reasons," "facility initiated placement for his own protection." Beneath all these stated reasons is one inescapable underlying fact: every time Defendants placed him in segregation, it was because of his serious mental illness, which Defendants caused to deteriorate while he was in their custody.

91.     Mr. Sanchez Brito was in agony while in the RHU. He repeatedly told facility staff he wanted to return to the general population. Although Defendants occasionally did return him to general population, it was always short-lived. His deteriorating mental health would result in Defendants placing him back in solitary confinement for grossly excessive continuous periods, often many months in duration. In 2020, one continuous period of solitary confinement stretched to five months. There were other similarly lengthy periods, including another five-month continuous period immediately prior to his release in December 2021.

92.     The conditions in the RHU were unusually cruel and isolating, even compared to the segregation conditions in Yuba Jail. His cell was tiny, with only a bed, toilet, and sink, and no room for anything else. In width, an adult male of average height can nearly touch both walls by reaching out his hands. In length, there is not enough room for an adult male of average height to do a push-up, unless he separates his legs so that one foot is on either side of the toilet. There is no window to the outside in the cell. There is a television in the RHU, but to see it from one's cell, one has to be standing up and at the cell door.

93.     On information and belief, there are only three cells in the RHU at Mesa Verde, one of which is reserved for suicide watch, though Defendants sometimes use it for disciplinary segregation when the other two cells are occupied. There is only a tiny yard attached to the unit, which on information and belief takes about one hundred steps to walk around in circumference.

94.     In addition to the isolating physical structure, Defendants' treatment of Mr. Sanchez Brito in the RHU exacerbated the isolation. In general population, GEO provides very limited programming services for people imprisoned at Mesa Verde, but at least there are occasional arts and crafts, a weekly movie night in the chow hall, a purportedly "volunteer" work program, and a comparatively large workout yard with numerous exercise machines. Even these

minimal services provide the opportunity to socialize with others, which is a fundamental life necessity for everyone, and is particularly important for people with significant mental illness.

95.     The situation in the RHU was far bleaker by comparison. For Mr. Sanchez Brito, even the few services and programming opportunities available to people in general population were not available to him while he was in the RHU. On information and belief, he was denied access to all the services described in the preceding paragraph. When he was in administrative segregation, Mr. Sanchez Brito would get no more than one-to-two hours per day of access to the tiny outside area attached to the RHU, and he would get access to the library for one hour a week. However, even during these brief periods out of his cell, Defendants kept him isolated from other detained people and forced him to be alone.

96.     Mr. Sanchez Brito's conditions and out-of-cell time were not materially different whether he was in disciplinary segregation or administrative segregation.

97.     GEO staff often harassed and made fun of Mr. Sanchez Brito because of his mental illness. For instance, on at least one occasion while in the RHU, Mr. Sanchez Brito was having a mental health crisis and asked to use the phone so he could talk to his mom, but GEO staff told him no and instead made fun of him and harassed him while he was suffering.

98.     On information and belief, Defendants heavily medicated Mr. Sanchez Brito to the point of near-sedation. Most of Mr. Sanchez Brito's days came to be spent sleeping, occasionally running in place or performing limited exercise in the confines of his cell, and watching TV while standing up and looking through an opening in his cell door. Although he would regularly call his mother when he first entered ICE custody, by the end of his time he would call less frequently and would not call at all when he was isolated and doing poorly.

99.     Most of Mr. Sanchez Brito's medical visits were with nurses and social workers, not psychiatrists.

100.    Although ICE eventually began to conduct limited review of Mr. Sanchez Brito's extended solitary confinement, the cursory, rubber-stamp review did not comply with the robust requirements of ICE's written policies, including Directive 11065.1.

101.     In spring 2020, Mr. Sanchez Brito spent significant time in solitary confinement at Mesa Verde. On May 17 of that year, another individual with mental illness who GEO had placed in extended solitary confinement in the Mesa Verde RHU killed himself by hanging.

102.     In May 2020, ICE was given the opportunity to release Mr. Sanchez Brito in the context of litigation before this Court to reduce the population at Mesa Verde in response to the COVID-19 pandemic. *See Zepeda Rivas v. Jennings*, Case No. 3:20-cv-02731, (N.D. Cal. 2020). ICE opposed his release in a written submission to this Court that did not so much as mention his claim to citizenship or his pending citizenship case in the Eastern District of California pursuant to the Ninth Circuit's remand order in his removal case. It also did not mention that someone had hung himself a week earlier in the same segregated unit in which Mr. Sanchez Brito was being held.

103.     By late 2020, Mr. Sanchez Brito decompensated to the point that he could barely hold a conversation. He reported having seizures. He had given up hope, feeling as if he would never leave custody and would be stuck there for the rest of his life. He woke up from sleep unable to move. Medical reports from November 2020 indicate he had a possible psychotic break, was "unable to communicate in complete sentences," experienced headaches that he rated nine on a pain scale of ten, and had attempted suicide.

104.     On or about November 26, 2020, Defendants sent Mr. Sanchez Brito to Paradise Valley Hospital in San Diego County, where medical records indicate he was "acting bizarrely," "appears to be confused," and appeared "disheveled" and "unkempt." He received inpatient care there, and the hospital stabilized him. He was sent back to Mesa Verde in early December 2020.

105.     Unsurprisingly, his stability did not last once he returned to Mesa Verde. By spring 2021, he had decompensated again, and Defendants sent him to Columbia Regional Care Center ("Columbia Care") in South Carolina for in-patient mental health care and for precautions against suicide, because Mr. Sanchez Brito said he did not want to live anymore in detention. On information and belief, Columbia Care acts as an ICE subcontractor to treat people in ICE custody who have serious mental illness. At all times while in Columbia Care, such individuals are still in ICE custody. At some point during his time at Columbia Care, Mr. Sanchez Brito was

forcibly medicated. He spent the majority of time at Columbia Care in isolation. He was only able to call his family on weekends, the only times that the calls were free.

106.     In or around July 2021, ICE returned Mr. Sanchez Brito to Mesa Verde from Columbia Care. Defendants promptly sent him back to solitary confinement, where he remained for the rest of his time in ICE custody.

### *District Court Citizenship Proceedings: 2018-2022*

107.     While Mr. Sanchez Brito was suffering in Defendants' custody, his citizenship proceedings were playing out in the District Court for the Eastern District of California before the Honorable Kimberly J. Mueller, after the Ninth Circuit had transferred the case on December 19, 2017.

108.     On July 14, 2020, Judge Mueller denied the United States' motion for summary judgment, finding that "a genuine question of material fact exists regarding plaintiff's ability to rebut the presumption of alienage through substantial credible evidence." *Brito v. Barr*, No. 2:18-CV-00097-KJM-DB, 2020 WL 4003824, at *8 (E.D. Cal. July 15, 2020). Specifically, the court held that Ms. Lopez's testimony about Mr. Sanchez Brito's birth, combined with her listing him as a U.S. citizen in a U-visa application that predated his proceedings, while listing her daughter as born in Mexico, was sufficient to "raise a genuine question of fact regarding whether he was born in the United States[.]" *Id.* The legal implications of Judge Mueller's order included (1) that the United States had not met its burden to establish Mr. Sanchez Brito was a non-citizen by clear and convincing evidence, based on the undisputed evidence, and (2) that, although the court could not determine whether Mr. Sanchez Brito provided "substantial credible evidence" of his U.S. citizenship without a trial, there was necessarily at least "some probative evidence" (as defined by Directive 16001.2) that Mr. Sanchez Brito was a U.S. citizen. Despite this summary judgment order – which was issued months before Mr. Sanchez Brito's apparent psychotic break in fall 2020 – Defendants continued to imprison Mr. Sanchez Brito at Mesa Verde, in violation of Directive 16001.2.

109.     Seven months later, on February 21, 2021, the court held a bench trial on Mr. Sanchez Brito's citizenship claim. The court heard testimony from Ms. Lopez and Officer

Grasso, as well as Gretchen Kuner, Co-founder of the Institute for Women in Migration, who testified as an expert on binational families from Mexico. Among other things, Ms. Kuner explained that prior to 1997, Mexican law did not allow for automatic Mexican nationality for U.S.-born children of Mexican parents. As a result, it was common for undocumented Mexican parents with U.S.-born children to register those children as born in Mexico for a number of reasons, including as a precaution if the parents were deported. She also testified that it was extremely easy to do so, and that it was not uncommon for grandparents to fraudulently register children as born in Mexico who were not, even without the presence of the parent or child. By this point, Mr. Sanchez Brito had been hospitalized based on his deteriorating mental health, yet after hearing this obviously probative testimony, the United States continued to imprison him.

110.    On December 10, 2021, Judge Mueller issued her ruling, finding that Mr. Sanchez Brito "has produced 'substantial credible evidence,' by a preponderance of the evidence, of his U.S. citizenship," and concluding that he "is a U.S. citizen." *Sanchez v. Garland*, No. 2:18-CV-00097-KJM-DB, 2021 WL 5867473, at *9 (E.D. Cal. Dec. 10, 2021). The court noted that Mr. Lopez's testimony about her son's birth was "corroborated by her consistent past reports of Brito's U.S. birth made in government documents, which she completed before his citizenship was in dispute," and by "Ms. Kuhner's opinions" regarding fraudulent Mexican birth registrations. *Id.* at *8.

111.    The court also found that Officer Grasso's investigation of Mr. Sanchez Brito's birth was "incomplete," faulting him for not "asking Ms. Lopez about Brito's birth," for "not considering the cultural context of the Mexican registration of the birth," and for "his unquestioning reliance on information in databases" that Mr. Sanchez Brito was born in Mexico when they actually "contain[ed] conflicting information" about his birth. *Id.*, at *8, 9 (E.D. Cal. Dec. 10, 2021). The court found that "Officer Grasso also did not evaluate critically the information contained in the Mexican birth certificate, which was registered three months after

Brito's undisputed birth date, with the delayed registration raising a potential red flag." *Id.* at *9 (E.D. Cal. Dec. 10, 2021).[7]

112.    It was only after this decision that ICE relented and that same day, at long last after imposing nearly seven grueling years of unjustified confinement, released Mr. Sanchez Brito from custody. In defiance of Directive 16001.2's unequivocal requirement of release when there is merely "some probative evidence" of U.S. citizenship, which "need not" rise to the level of "a preponderance of evidence," ICE steadfastly refused to relinquish custody of Mr. Sanchez Brito until a court found that he produced a preponderance of evidence.

113.    However, Defendants were not finished mistreating Mr. Sanchez Brito. With no transition plan at all for their fellow citizen who had just spent the last five straight months in solitary confinement after a psychotic break, ICE officers released Mr. Sanchez Brito directly to the street in a highly confused and deteriorated mental state, with only four days' worth of medication.

### E.    Mr. Sanchez's Death

114.    By the time Defendants finally released him, the damage they caused had been done. When Mr. Sanchez Brito entered ICE custody, he was coherent, oriented to place and time, and able to sustain ordinary conversation. His mental health symptoms were reasonably controlled. But Defendants' treatment of Mr. Sanchez Brito systematically wore him down and broke him, causing significant decompensation, several psychotic breaks, and permanent harm to his mental health. Defendants caused his physical well-being to suffer as well. In September 2015, months after he entered ICE custody, he weighed 192 pounds. By June 2020, he weighed a scant 165 pounds.

115.    Mr. Sanchez Brito was unable to recover from the trauma of his imprisonment. After his release, he was paranoid and fearful. He would avoid others by going on long walks

---

[7] This ruling was later amended on reconsideration to exclude references to evidence that had not been admitted. *Sanchez v. Garland,* No. 2:18-CV-00097-KJM-DB, 2022 WL 4237801 (E.D. Cal. Sept. 14, 2022). The amended ruling, which supersedes the December 10, 2021 ruling, did not repeat the court's earlier findings regarding Mr. Grasso's incomplete investigation, but it reached the same conclusion regarding Mr. Sanchez Brito's U.S. citizenship.

during the day and by sleeping under his bed or behind a pile of clothes at night. He had

nightmares and would constantly relive his ordeal.

116.    In April 2022, Mr. Sanchez Brito disappeared from home, and his brother found

him two weeks later in a homeless encampment in Marin County. He appeared not to have

showered for weeks and refused to leave with his brother. Ms. Lopez then went to see him, and

he told her that he was scared to be around people he knew and felt safer in a place where

nobody knew who he was. She ultimately persuaded him to go back home.

117.    On May 9, 2022, Mr. Sanchez Brito's mental health had deteriorated to the point

that Ms. Lopez felt that he was a danger to himself, and she requested that he be civilly

committed to a hospital in Marin County. However, he promptly left the hospital and later that

day called his mother and told her that he loved her with all his heart.

118.    He did not come home again. Two days later, on May 11, 2022, a Solano County

detective called Ms. Lopez and informed her that Mr. Sanchez Brito's body had been found in an

abandoned building in Vallejo. The medical examiner later determined he had died by drug

overdose. He was 32 years old. Ms. Lopez believes his last call had been to tell her goodbye.

119.    As a result of Defendants' actions, eleven-year-old V-S- will never know his

father.

120.    Mr. Sanchez Brito lived for twenty-five years and twenty-four days before

entering ICE custody. He spent six years, seven months, and sixteen days – nearly half of his

adult life – imprisoned and abused by ICE and its subcontractors, including GEO. He survived

only 152 days after his release.

### F.  Defendants' Patterns and Practices of Conduct Relevant to this Case

#### *ICE Targeting of Home-Birthed U.S. Citizens of Mexican Descent*

121.    Officer Grasso's and ICE's tunnel-vision insistence on imprisoning Mr. Sanchez

Brito occurred in a larger context of ICE engaging in a practice of pursuing the removal of

individuals claiming U.S. citizenship based on home birth to Mexican mothers.

122.    ICE has conducted such enforcement efforts even when the agency knew that the

individuals it targeted had lived their entire lives in the United States as U.S. citizens. ICE

pursued such enforcement efforts even when the birth was years ago, and the agency was aware that witnesses to the birth would have long since moved or passed away, as in Mr. Sanchez Brito's case. This practice had been going on prior to, during, and after Mr. Sanchez Brito's arrest. Because of this practice, ICE agents were or should have been aware that giving birth at home is a common practice in all cultures, including Mexican culture, and that a not-insignificant number of undocumented mothers from Mexico would have feared coming out of the shadows to give birth in a United States hospital. As a result, ICE agents were aware that such enforcement actions would ensnare potential U.S. citizens, yet the agency persisted in its practice of targeting home-birthed U.S. citizens of Mexican descent for removal.

123.    In addition, ICE was or should have been aware, through its pattern of enforcement against home-birthed U.S. citizens of Mexican descent, that it was commonplace for Mexican families with U.S.-born children to later register those children as born in Mexico, out of a fear that, if deported or if they decided to return to Mexico voluntarily, their children would not be able to access services if the children were not so registered. Nevertheless, ICE persisted in its pattern of enforcement against home-birthed U.S. citizens and vigorously challenged such claims, including by imprisoning claimants to U.S. citizenship, as in Mr. Sanchez Brito's case.

### Defendants' Use of Prolonged Solitary Confinement and ICE's Failure to Monitor Contractors' Use of Segregation

124.    Although ICE contracts out for the performance of its detention duties, ICE bears ultimate non-delegable responsibility for those duties, and ICE did or should have recognized that Yuba County's and GEO's performance of those duties were likely to create a particular risk of physical harm in the absence of special precautions, which ICE did not take.

125.    This is particularly true regarding the imposition of prolonged solitary confinement in ICE custody. On October 13, 2021, the DHS Office of Inspector General ("OIG") issued a memorandum to ICE entitled *ICE Need to Improve Its Oversight of Segregation Use in Detention Facilities.*[8] OIG analyzed detention files from 2015 through 2019

---

[8] DHS Office of Inspector General, *ICE Needs to Improve Its Oversight of Segregation Use in Detention Facilities*, OIG-22-01 (Oct. 13, 2021), available at https://www.oig.dhs.gov/sites/default/files/assets/2021-10/OIG-22-01-Oct21.pdf.

and found that ICE lacked any evidence "showing it considered alternatives to segregation for 72 percent of segregation placements," destroyed detention files, lacked "effective oversight and clear policies to ensure accurate and comprehensive tracking and reporting on the use of segregation," and "prevent[ed] transparency with Congress and the public about the prevalence of segregation use."[9]

126.    Defendant GEO also engages in a pattern and practice of confining people in segregation for prolonged periods. On July 13, 2023, several non-profit organizations submitted an administrative complaint documenting the abuse and overuse of segregation by GEO in its ICE detention facility in Aurora, Colorado.[10] The complaint documented several incidents in which GEO had imposed weeks of solitary confinement under inhumane conditions and alleged violations of applicable detention standards and the Rehabilitation Act.

127.    The United States and its agents, as well as GEO, are aware of the devastating impacts of solitary confinement, which has become common knowledge. As noted above, one individual killed himself during a period of extended solitary confinement at Mesa Verde during the same timeframe that Mr. Sanchez Brito was being held in the same unit. Studies have found that "More than a third (33%) of people held in solitary confinement become psychotic and/or suicidal within the first 15 days, and people who have been subjected to solitary confinement are 78% more likely to commit suicide within a year of being released from prison."[11] The harm of

---

[9] *Id.*

[10] American Immigration Council, National Immigration Project of the National Lawyer's Guild, and Rocky Mountain Advocacy Network, *Complaint Detailing Abusive Overuse of Solitary Confinement and Mistreatment That Disproportionately Impacts Persons with Disabilities at the Aurora Contract Detention Facility* (July 12, 2023), https://www.americanimmigrationcouncil.org/sites/default/files/research/misuse_of_solitary_confinement_in_colorado_immigration_detention_center_complaint.pdf

[11] *Written Submission of Robert F. Kennedy Human Rights to the International Independent Expert Mechanism to Advance Racial Justice and Equality in the context of Law Enforcement* (Feb. 24, 2023), https://rfkhumanrights.org/written-submission-of-rfk-human-rights-to-the-international-independent-expert-mechanism-to-advance-racial-justice-and-equality-in-the-context-of-law-enforcement (citing Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime and Delinquency 124 (2003); Lauren Brinkley-Rubinsten, Josie Sivaraman & David L. Rosen, Association of Restrictive Housing During Incarceration with Mortality After Release, JAMA Network Open (2019).

prolonged solitary confinement is widely known to be particularly devastating for people with significant mental illness. Yet, despite being aware of the harm, Defendants engage in a willful pattern and practice of imposing prolonged solitary confinement on people in their custody, as they did to Mr. Sanchez Brito, and they will continue to do so until they are held accountable.

## CAUSES OF ACTION

### COUNT ONE
**Federal Tort Claims Act: False Imprisonment**
***Defendant United States***

128.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

129.    The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

130.    Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

131.    At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

132.    ICE is not authorized to detain a U.S. citizen for removal proceedings.

133.    Agents of the United States violated Directive 16001.1 by arresting and imprisoning Mr. Sanchez Brito based on the cursory, inadequate, illegal, and incomplete investigation of Officer Grasso and others.

134.    Agents of the United States violated Directive 16001.2 by continuing to imprison Mr. Sanchez Brito's. At all times Directive 16001.2 was in effect, ICE agents were aware of "some probative evidence," as defined by Directive 16001.2, that Mr. Sanchez Brito was a U.S. citizen.

135.     Agents of the United States intentionally imprisoned Mr. Sanchez Brito, a U.S. citizen, for an appreciable period of time without lawful privilege and without his consent. This act constituted the tort of false imprisonment under the laws of the State of California.

136.     In falsely imprisoning Mr. Sanchez Brito, agents of the United States caused damages, including significant harm, pain, suffering, loss of freedom, and loss of enjoyment of life to Mr. Sanchez Brito.

**COUNT TWO**
**Federal Tort Claims Act: Negligence**
***Defendant United States***

137.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

138.     The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

139.     Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

140.     At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

141.     Agents of the United States owed a duty of care to Mr. Sanchez Brito while he was in their custody and when considering taking him into custody.

142.     Agents of the United States breached their mandatory, non-discretionary duties to Mr. Sanchez Brito, including in the following ways:

    a.   Violating applicable, mandatory, and binding policies;

    b.   Failing to adequately investigate his citizenship claim prior to ICE taking custody of him and during his imprisonment in ICE custody;

    c.   Failing to follow California law regarding juvenile records in investigating Mr. Sanchez Brito's citizenship claim;

d.   Failing to release him when they had some probative evidence of his U.S. citizenship;

e.   Failing to ensure the conditions of his confinement did not amount to punishment;

f.   Failing to protect him against prolonged confinement, including prolonged solitary confinement, or to follow binding policies regarding their oversight of his prolonged solitary confinement;

g.   Failing to abate known substantial risk of serious harm and to protect him from harm, including harm to his physical and mental health;

h.   Failing to release him when his solitary confinement became prolonged, whether outright or under the abundant alternatives to incarceration the agency had at its disposal and did not use; and

i.   Releasing him to the street without adequate protection against harm and with inadequate medication.

143.   The breaches of duty by agents of the United States were the direct, proximate, and legal cause of harm and injuries to Mr. Sanchez Brito, including pain, suffering, loss of freedom, and loss of enjoyment of life.

144.   The actions of Defendant United States and its agents constitute the tort of negligence under the laws of the State of California.

## COUNT THREE
**Federal Tort Claims Act: Intentional Infliction of Emotional Distress**
***Defendant United States***

145.   All the foregoing allegations are repeated and realleged as though fully set forth herein.

146.   The United States is liable under the FTCA for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); 28 U.S.C. § 2674.

147.    Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

148.    At all relevant times, ICE officials acted within the scope of their employment and/or official duties as employees of DHS, an agency of the United States.

149.    Agents of the United States engaged in outrageous conduct that was intended to cause or that recklessly disregarded the possibility of causing emotional distress to Mr. Sanchez Brito, knowing Mr. Sanchez Brito was present or in ICE custody when the conduct occurred. This conduct included:

    a.  Violating applicable, mandatory, binding policies;

    b.  Refusing to release him when they had some probative evidence of his U.S. citizenship;

    c.  Willfully and deliberately engaging in tactics that would obviously prolong his imprisonment;

    d.  Refusing to release him under ample alternatives to incarceration that were readily available;

    e.  Willfully and deliberately subjecting him to conditions of civil confinement that amounted to punishment;

    f.  Willfully and deliberately subjecting him to dangerous conditions of confinement and prolonged confinement, including prolonged solitary confinement; and

    g.  Releasing him to the street without adequate protection against harm and with inadequate medication.

150.    The conduct of United States officials was the actual and proximate cause of or a substantial factor in causing Mr. Sanchez Brito's emotional suffering.

151.    The actions of the United States constitute the tort of intentional infliction of emotional distress under the laws of the State of California.

/

/

/

**COUNT FOUR**
**Violation of the Rehabilitation Act – 29 U.S.C. § 794**
*Defendant GEO*

152.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

153.    Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

154.    Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in any program or activity receiving federal financial assistance or conducted by any Executive agency. 29 U.S. § 794. Damages may be recovered against government contractors under the Rehabilitation Act.

155.    Defendant GEO operates, and at all times relevant operated, at least one program or activity for ICE for which it receives federal financial assistance. This includes subsidies GEO receives from the federal government in connection with its so-called "Voluntary Work Program." Under this program, the United States authorizes GEO to use the labor of people incarcerated in its facilities, including Mesa Verde, to perform essential work for the operation of the facilities that would otherwise have to be performed by hiring additional staff or contractors in the community at market rates. The United States provides GEO a stipend of at least $1 per day for each such individual.

156.    On information and belief, to the extent GEO offers other programs, including its medical program, it also receives federal subsidies to operate some of those programs.

157.    Alternatively, GEO also administers at Mesa Verde a program or activity conducted by an Executive agency, namely ICE's immigration detention program. ICE considers the operation of immigration detention facilities to be a federally conducted program for purposes of the Rehabilitation Act, and the agency contracts with GEO for the performance of this program on its behalf at various locations, including Mesa Verde.

158.    Mr. Sanchez Brito was an individual with a disability as defined by the Rehabilitation Act. He was diagnosed with and was regarded as having schizoaffective disorder, a mental impairment that substantially limited one or more of his major life activities.

159.    GEO deliberately and/or with deliberate indifference discriminated against Mr. Sanchez Brito by, among other things:

    a.  Unnecessarily and unreasonably subjecting him to solitary confinement, including for prolonged periods;

    b.  Denying him access to programming and services, including programming and services available to people in general population such as ordinary yard and recreation time, arts and crafts, work programs, education, and other programming;

    c.  Failing to ensure proper treatment of his medical condition, including by failing to administer Invega Sustenna – the only treatment known to work for Mr. Sanchez Brito – simply because it was not on the authorized "schedule";

    d.  Failing to provide adequate medication upon release, denying him full access to appropriate medical and mental health services; and

    e.  Harassing him and verbally abusing him through its guards and failing to protect him from known harassment and verbal abuse by guards and other detained people.

160.    GEO failed to accommodate Mr. Sanchez Brito's disability by providing access to programs and activities, including but not limited to the work program. GEO's discrimination against and treatment of Mr. Sanchez Brito described herein occurred solely or substantially because of his disability. Had he not been disabled, Mr. Sanchez Brito would have been otherwise eligible for the programming and activities he was denied.

161.    GEO was aware that its conduct and treatment of Mr. Sanchez Brito, including as described in the preceding two paragraphs, was substantially likely to result in harm to his federally protected rights, including rights to reasonable safety, to adequate medical care, to be free from arbitrary or prolonged detention, to be free form harsh conditions of confinement, and to be free from disability discrimination. GEO failed to act upon that likelihood.

162.    GEO's discrimination against Mr. Sanchez Brito on account of his disability and its failure to accommodate Mr. Sanchez Brito's disability caused him harm, including pain,

suffering, severe emotional distress, decompensation of his mental health, loss of freedom, and loss of enjoyment of life.

## COUNT FIVE
### Cal. Civ. Code §§ 51, 52 (Unruh Act): Disability Discrimination
### *Defendant GEO*

163.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

164.    Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

165.    Mr. Sanchez Brito was an individual with a mental disability as defined by the Cal. Civ. Code §§ 12926, 12926.1. He was diagnosed with and was regarded as having schizoaffective disorder, a mental or psychological condition that limited a major life activity.

166.    GEO and its facility Mesa Verde are business establishments doing business in California and are otherwise governed by California laws protecting the rights of individuals with disabilities.

167.    GEO denied, aided in denial of, made a distinction that denied, and/or discriminated against Mr. Sanchez Brito resulting in a denial to Mr. Sanchez Brito of full and equal access to advantages, accommodations, facilities, privileges, and services to Mr. Sanchez Brito, including:

a.    Unnecessarily and unreasonably subjecting him to solitary confinement, including for prolonged periods;

b.    Denying him access to programming and services, including programming and services available to people in general population such as ordinary yard and recreation time, arts and crafts, work programs, education, and other programming;

c.    Failing to ensure proper treatment of his medical condition, including by failing to administer Invega Sustenna – the only treatment known to work for Mr. Sanchez Brito – simply because it was not on the authorized "schedule";

d.   Failing to provide adequate medication upon release, denying him full access to appropriate medical and mental health services; and

e.   Harassing him and verbally abusing him through its guards and failing to protect him from known harassment and verbal abuse.

168.   GEO's conduct described in the preceding paragraph was intentional or committed with deliberate indifference. A substantial motivating reason for GEO's conduct was Mr. Sanchez Brito's mental illness, and GEO's conduct was a substantial motivating reason in causing Mr. Sanchez Brito harm, including pain, suffering, severe emotional distress, decompensation of his mental health, loss of freedom, and loss of enjoyment of life.

## COUNT SIX
### Cal. Civ. Code § 1714: Negligence
### *Defendant GEO*

169.   All the foregoing allegations are repeated and realleged as though fully set forth herein.

170.   Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

171.   Defendant GEO owed a duty of care to Mr. Sanchez Brito and breached its mandatory, non-discretionary duties to him, including in the following ways:

a.   Failing to protect him against prolonged confinement, including prolonged solitary confinement;

b.   Failing to ensure safe conditions of confinement and/or to abate or protect him from known substantial risk of serious harm, including harm to his physical and mental health;

c.   Failing to ensure proper treatment of his medical condition, including by failing to administer Invega Sustenna – the only treatment known to work for Mr. Sanchez Brito – simply because it was not on the authorized "schedule"; and

d.   Releasing him to the street without adequate protection against harm and with inadequate medication.

172.    GEO's breaches of duty described in the preceding paragraph constitute negligence and were a substantial factor in causing Mr. Sanchez Brito harm, including pain, suffering, severe emotional distress, decompensation of his mental health, loss of freedom, and loss of enjoyment of life.

## COUNT SEVEN
### Intentional Infliction of Emotional Distress
### *Defendant GEO*

173.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

174.    Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

175.    Defendant GEO, as well as staff and contractors working under GEO's direction and supervision, engaged in outrageous conduct, that was intended to cause or that recklessly disregarded the possibility of causing emotional distress by Mr. Sanchez Brito, knowing Mr. Sanchez Brito was present when the conduct occurred. This conduct included:

    a.  Subjecting him to dangerous conditions of confinement, including prolonged solitary confinement;

    b.  Denying him access to Invega Sustenna – the only treatment known to work for Mr. Sanchez Brito – simply because it was not on the authorized "schedule," even when his mental health was obviously deteriorating without it;

    e.  Harassing him and verbally abusing him; and

    f.  Releasing him to the street without adequate protection against harm and with inadequate medication.

176.    GEO's actions and conduct were a substantial factor in causing Mr. Sanchez Brito to suffer emotional distress, and they constitute the tort of intentional infliction of emotional distress under the laws of the State of California.

/

/

**COUNT EIGHT**
**Cal. Gov. Code § 7320: Violation of Detention Standards**
*Defendant GEO*

177.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

178.    Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

179.    GEO is a private detention facility operator.

180.    GEO is required to exercise a duty of ordinary care and skill in adhering to the detention standards of care agreed upon in the Mesa Verde contract for operations.

181.    The contract between GEO and ICE requires compliance with ICE's 2011 PBNDS, which set the applicable standards of care at all times during Mr. Sanchez Brito's incarceration at Mesa Verde. These standards required GEO to, among other things:

   a.   Ensure that individuals imprisoned at Mesa Verde are housed "in the least restrictive… setting possible";

   b.   Make "every effort" to ensure individuals imprisoned at Mesa Verde with serious mental illness are places "in a setting in or outside of the facility in which appropriate treatment can be provided, rather than an isolation unit, "if separation from the general population is necessary";

   c.   Use isolation only as a "last resort" for individuals imprisoned at Mesa Verde with special vulnerabilities;

   d.   Ensure that individuals in protective custody are to be provided with the same access to services as those in the general population, to the extent possible;

   e.   Not place any individuals into an isolation unit based solely on their disability;

   f.   Consider how an person's disability or mental illness "contributed to" behavior or perceived misconduct when determining what discipline to administer;

   g.   Consult with a "mental health professional" in any disciplinary process involving someone with a mental illness;

h.  Provide "medically necessary and appropriate medical… and mental health care and pharmaceutical services" to individuals in custody; and

i.  Provide to individuals, upon their release from ICE custody, "medication, referrals to community-based providers as medically appropriate, and a detailed medical case summary" to ensure continuity of care.

182.  In Mr. Sanchez Brito's case, GEO, including through its contractors, negligently and willfully violated each of the requirements of the PBNDS described in the preceding paragraph, causing Mr. Sanchez Brito harm, including pain, suffering, severe emotional distress, decompensation of his mental health, loss of freedom, and loss of enjoyment of life.

## COUNT NINE
### Cal. Civ. Code § 52.1 (Bane Act): Violation of Constitutional or Statutory Right
### *Defendant GEO*

183.  All the foregoing allegations are repeated and realleged as though fully set forth herein.

184.  Plaintiff brings this cause of action as legal guardian to V-S-, successor in interest to Mr. Sanchez Brito under California Code of Civil Procedure § 377.30 (Survival Action).

185.  GEO, its employees, and contractors intentionally interfered with or attempted to interfere with Mr. Sanchez Brito's civil rights by threats, intimidation, or coercion.

186.  GEO's intentional, intimidating, and coercive use of solitary confinement, verbal harassment, and denial of appropriate and necessary medication and medical care caused Mr. Sanchez Brito  to reasonably believe that if he exercised his right as a U.S. citizen to be free from civil immigration detention, to be housed in a less restrictive setting than solitary confinement, or to be subjected to conditions of confinement less restrictive than criminal custody, that GEO would commit an act of violence against him.

187.  GEO intentionally acted violently against Mr. Sanchez Brito to prevent him from exercising his rights as a U.S. citizen to be free from civil immigration detention, to be housed in a less restrictive setting, or to be subjected to conditions of confinement less restrictive than criminal custody, including by forcibly placing him in prolonged solitary confinement.

188.   GEO use of violence, threats, and intimidation were intended to deprive Mr. Sanchez Brito of his rights as a U.S. citizen to be free from civil immigration detention, to be housed in a less restrictive setting than solitary confinement, or to be subjected to conditions of confinement less restrictive than criminal custody, including by forcibly placing him in prolonged solitary confinement.

189.   GEO's conduct caused or was a substantial factor in causing Mr. Sanchez Brito harm, including pain, suffering, severe emotional distress, decompensation of his mental health, loss of freedom, and loss of enjoyment of life.

## PRAYER FOR RELIEF

190.   Pursuant to the foregoing causes of action, Plaintiff prays that this Court grant the following relief:

a.   Award compensatory and punitive damages to Plaintiff and V-S- in an amount to be proven at trial;

b.   Award reasonable costs and attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(b), 29 U.S.C. § 794a; Cal. Gov. Code § 7320(c), and any other applicable statute or regulation, to the extent allowable by such statute or regulation; and

c.   Grant such further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

191.   Pursuant to Civil L.R. 3-6(a) and Fed. R. Civ. P. 38, Plaintiff hereby demands a trial by jury of all claims so triable in this action (Causes of Action Four through Nine).

August 23, 2023                          Respectfully submitted,

By: */s/ Bardis Vakili*_____
Bardis Vakili
Law Office of Bardis Vakili, P.C.

*Attorney for Plaintiff Rosa Lopez and Minor V-S-*

COMPLAINT
44