1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7     ROSA LOPEZ,                                 Case No.  23-cv-04292-DMR

8                    Plaintiff,

9           v.                                    **ORDER ON MOTION TO TRANSFER
                                                  AND MOTIONS TO DISMISS**
10    UNITED STATES OF AMERICA, et al.,
                                                  Re: Dkt. Nos. 12, 13, 15
11                   Defendants.

12          Plaintiff Rosa Lopez, as legal guardian of V.S, a minor and successor in interest to the

13    estate of Victor Sanchez Brito ("Sanchez Brito"), filed this lawsuit against Defendants United

14    States and GEO Group, Inc. ("GEO"), asserting several claims under the Federal Tort Claims Act

15    ("FTCA"), the Rehabilitation Act, and state law arising out of Sanchez Brito's arrest and

16    detention.  GEO now moves pursuant to 28 U.S.C. § 1404(a) to transfer venue to the Eastern

17    District of California.  [Docket No. 12.]  GEO also moves pursuant to Federal Rule of Civil

18    Procedure 12(b)(6) to dismiss the complaint.  [Docket No. 13.]  The United States separately

19    moves pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the complaint.  [Docket No. 15.]  The

20    court held a hearing on March 28, 2024.  For the following reasons, GEO's motions to transfer

21    and to dismiss are denied.  The United States's motion to dismiss is granted in part and denied in

22    part.[1]

23

24

25

26    [1] After the briefing on the motions was complete, Lopez filed a notice of supplemental authority to
      which the government objected because Lopez included argument in the notice.  [Docket Nos. 32,
27    33.]  The government asked the court to strike the filing, or in the alternative, grant it the
      opportunity to respond.  It included argument with its objection.  [Docket No. 33.]  Although the
28    court will consider the supplemental authority, it declines to consider either side's argument
      regarding that authority.

United States District Court
Northern District of California

## I.       BACKGROUND

### A.       Factual Background

Plaintiff makes the following allegations in the complaint, all of which are taken as true for purposes of the motion to dismiss.[2]  Victor Sanchez Brito was born in California in 1990.  He lived with schizoaffective disorder, bipolar type and a cognitive disability.  Rosa Lopez is Sanchez Brito's mother and the court-appointed legal guardian of V.S., a minor and Sanchez Brito's son. [Docket Nos. 1 (Compl.) ¶¶ 2, 3, 13; 1-1 (Lopez Decl. Aug. 15, 2023) ¶¶ 4, 5.]

At the time of Sanchez Brito's birth, Lopez was in a violent and abusive relationship with his father, Victor Sanchez Carrillo.  Lopez and Carrillo lived in a trailer on a ranch in Temecula, California, where they worked.  Carrillo did not allow Lopez to leave the ranch for any reason. Lopez gave birth to Sanchez Brito in the trailer in which she lived.  She did not register Sanchez Brito's birth in the United States or obtain a birth certificate because she was not allowed to leave the ranch.  Compl. ¶¶ 36-39.  Lopez eventually fled to the San Francisco Bay Area where her children joined her.  *Id*. at ¶ 44.

Sanchez Brito began experiencing symptoms of mental illness when he was 13 or 14 and "had run-ins with the law that resulted in juvenile court proceedings" and probation.  *Id*. at ¶ 43. He continued to have run-ins with the law as an adult.  On April 25, 2015, Sanchez Brito was scheduled to be released from the Marin County Jail after completing a criminal sentence.  At the time, Immigration and Customs Enforcement ("ICE") Officer Marco Grasso was stationed at the Marin County Jail to identify incarcerated individuals who were potentially subject to removal from the United States.  *Id*. at ¶ 49.  Grasso had access to the jail's booking system, which listed Sanchez Brito as a U.S. citizen, but other entries identified Mexico as Sanchez Brito's birthplace. Grasso interviewed Sanchez Brito, who told him he had been born in California, but Grasso did not believe him.  *Id*. at ¶ 50.  Grasso obtained a delayed Mexican birth registration that Grasso "assumed established Mr. Sanchez Brito was born in Mexico," but the registration "had significant

---

[2] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint."  *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

and obvious defects on its face that undermined its reliability as proof of Mexican birth." *Id*. at ¶¶ 51-54.  After performing a "perfunctory and inadequate investigation" into Sanchez Brito's place of birth, Grasso "decided ICE should arrest Mr. Sanchez Brito as a non-citizen and imprison him without bond for removal proceedings."  ICE took Sanchez Brito into custody on the same day he was released from the Marin County Jail.  *Id*. at ¶ 54-59.

Lopez alleges that in arresting Sanchez Brito, Grasso failed to follow ICE Directive 16001.1, ICE's written policy for the detention of individuals with claims to U.S. citizenship; that policy required "immediate and careful investigation and analysis" and consultation with ICE attorneys.  *Id*. at ¶¶ 23-24, 60.  Instead, ICE deemed Sanchez Brito subject to the "so-called mandatory detention provisions of the [Immigration and Naturalization Act, "INA"], 8 U.S.C. § 1226(c)" based on his criminal history and Mexican citizenship.  *Id*. at ¶ 62.[3]

On April 27, 2015, ICE transferred Sanchez Brito to the Yuba Jail, which contracted with ICE to imprison ICE detainees.  ICE was responsible for supervising the Yuba Jail's ICE detention operations and compliance with ICE detention standards and contractual duties and Lopez alleges on information and belief that ICE had officers on-site at the Yuba Jail every day.  *Id*. at ¶ 61.  Medical staff assessed Sanchez Brito and noted his schizophrenia diagnosis.  A psychiatrist noted that he had been receiving regular injections of Invega Sustenna to successfully manage his symptoms and ordered the treatment to continue.  *Id*. at ¶¶ 63, 64.  However, by the fall of 2015, staff began treating Sanchez Brito's mental illness with Seroquel and Risperdone because the Invega injections were not "covered" by ICE.  Sanchez Brito informed staff that Seroquel and Risperdone were not effective.  *Id*. at ¶ 68.

At a June 2015 immigration hearing, Lopez testified under oath that she gave birth to Sanchez Brito in California, that she never registered his birth, that she had never seen the delayed Mexican registration, and that a signature on the document purporting to be hers was not hers.  *Id*. at ¶ 69.  Lopez testified in court again in July 2015.  Other immigration court hearings were held in 2015 and 2016 at which the court considered Sanchez Brito's citizenship.  ICE continued to

---

[3] 8 U.S.C. § 1226(c) requires the Attorney General to detain noncitizens who have committed certain criminal offenses.

detain Sanchez Brito during the proceedings.  *Id*. at ¶¶ 70-74.  Lopez also alleges that in

November 2015, ICE issued a new policy regarding detention of individuals claiming U.S.

citizenship, Directive 16001.2.  Lopez alleges that Directive 16001.2 required that individuals in

ICE custody "for whom there was at least 'some probative evidence' of U.S. citizenship must be

immediately released," and that ICE continued to detain Sanchez Brito in violation of the new

directive.  *Id*. at ¶ 72; *see id*. at ¶¶ 26-29.In January 2017, an immigration judge ordered Sanchez

Brito removed.  The Board of Immigration Appeal upheld the order of removal in July 2017.

Sanchez Brito timely petitioned for review to the Ninth Circuit.  *Id*. at ¶ 75.  In December 2017,

the Ninth Circuit transferred Sanchez Brito's petition for review to the United States District Court

for the Eastern District of California for de novo review of his citizenship claim based on "a

genuine issue of material fact . . . as to petitioner's claim of United States citizenship."  The matter

was assigned to the Honorable Kimberly J. Mueller.  *Id*. at ¶¶ 76, 108.

 Lopez alleges that throughout his immigration proceedings, Sanchez Brito "was suffering

greatly" and his mental health was deteriorating.  He spent significant periods of time in solitary

confinement with limited access to programming, yard time, and other benefits.  Even when he

was in the general population, the conditions at the Yuba Jail "were widely known to be harsh."

*Id*. at ¶¶ 77-82.  In April 2018, Sanchez Brito was hospitalized due to his deteriorating mental

health.  *Id*. at ¶ 83.

 In July 2018, ICE transferred Sanchez Brito from the Yuba Jail to Mesa Verde, a detention

facility that Defendant GEO operates pursuant to a contract with ICE.  *Id*. at ¶ 84.  Lopez alleges

that "[p]eople in the general population at Mesa Verde are subjected to harsh conditions by

Defendants."  *Id*. at ¶¶ 87-89.  Sanchez Brito's mental health deteriorated further while at Mesa

Verde.  By September 2018, Defendants had placed him in administrative segregation for an

alleged safety concern and he "spent a substantial amount of the next three years in a cramped cell

in administrative segregation."  Lopez alleges that "every time Defendants placed [Sanchez Brito]

in segregation, it was because of his serious mental illness, which Defendants caused to deteriorate

while he was in their custody."  *Id*. at ¶¶ 90-97.  Lopez alleges on information and belief that

Defendants "heavily medicated Mr. Sanchez Brito to the point of near-sedation" and that most of

4

his medical visits were with nurses and social workers, not psychiatrists. *Id*. at ¶ 98-99. He was hospitalized twice in 2020 and 2021. *Id*. at ¶¶ 104, 105.

Meanwhile, in the district court proceedings reviewing Sanchez Brito's citizenship claim, Judge Mueller denied the United States' motion for summary judgment in July 2020, finding that "a genuine question of material fact exists regarding plaintiff's ability to rebut the presumption of alienage through substantial credible evidence." *Id*. at ¶ 108 (citing *Brito v. Barr*, No. 2:18-CV-00097-KJM-DB, 2020 WL 4003824, at *8 (E.D. Cal. July 15, 2020)). Notwithstanding this development, Lopez alleges that "Defendants continued to imprison Mr. Sanchez Brito at Mesa Verde, in violation of Directive 16001.2." *Id*. at ¶ 108.

The court held a bench trial in February 2021 on Sanchez Brito's citizenship claim and heard testimony from Lopez, Grasso, and an expert on binational families from Mexico. On December 10, 2021, the court found that Sanchez Brito "has produced 'substantial credible evidence,' by a preponderance of the evidence, of his U.S. citizenship" and concluded that he "is a U.S. citizen." *Id*. at ¶¶ 109, 110 (citing *Sanchez v. Garland*, No. 2:18-CV-00097-KJM-DB, 2021 WL 5867473, at *9 (E.D. Cal. Dec. 10, 2021)). Notably, "[t]he court also found that Officer Grasso's investigation of Mr. Sanchez Brito's birth was 'incomplete,' faulting him for not 'asking Ms. Lopez about Brito's birth,' for 'not considering the cultural context of the Mexican registration of the birth,' and for 'his unquestioning reliance on information in databases' that Mr. Sanchez Brito was born in Mexico when they actually 'contain[ed] conflicting information' about his birth." *Id*. at ¶ 111 (quoting *Sanchez*, 2021 WL 5867473, at *8, 9). "The court found that 'Officer Grasso also did not evaluate critically the information contained in the Mexican birth certificate, which was registered three months after Brito's undisputed birth date, with the delayed registration raising a potential red flag.'" *Id*. at ¶ 111 (quoting *Sanchez*, 2021 WL 5867473, at *9).[4]

ICE released Sanchez Brito from custody the same day. Lopez alleges that "ICE officers

---

[4] The December 10, 2021 Order was subsequently amended on reconsideration. The amended opinion does not repeat the court's earlier findings about Grasso's investigation. Compl. ¶ 111 n.7 (citing *Sanchez v. Garland*, No. 2:18-CV-00097-KJM-DB, 2022 WL 4237801 (E.D. Cal. Sept. 14, 2022)).

United States District Court
Northern District of California

released Mr. Sanchez Brito directly to the street in a highly confused and deteriorated mental state, with only four days' worth of medication." *Id*. at ¶¶ 112, 113.  Sanchez Brito's mental health continued to deteriorate following his release.  On May 11, 2022, Lopez was informed that Sanchez Brito's body had been found in an abandoned building.  He was later determined to have died by drug overdose.  *Id*. at ¶¶ 115-18.  Sanchez Brito had spent over six and a half years in ICE detention.  He spent three years and five months in GEO's facility.  *See id*. at ¶ 120.

Lopez filed an administrative tort claim with ICE on November 29, 2022.  ICE confirmed receipt of the same on February 8, 2023.  *Id*. at ¶¶ 16, 17.

### B.    Procedural Background

Lopez filed the complaint on August 23, 2023.  She brings all claims on V.S.'s behalf in her capacity as his legal guardian.  V.S. is Sanchez Brito's sole successor in interest under California Code of Civil Procedure section 377.30.  *See* Compl. ¶¶ 13, 130, 139, 147, 153, 164, 170, 174, 178, 184.

Lopez alleges the following claims against the United States: 1) false imprisonment; 2) negligence; and 3) intentional infliction of emotional distress.  Compl. 33-36.

Lopez alleges the following claims against GEO: 1) violation of the Rehabilitation Act, 29 U.S.C. § 794; 2) disability discrimination in violation of the Unruh Act, California Civil Code sections 51, 52; 3) negligence; 4) intentional infliction of emotional distress; 5) violation of detention standards, California Government Code section 7320; and 6) violation of the Bane Act, California Civil Code section 52.1.

GEO moves pursuant to 28 U.S.C. § 1404(a) to transfer the case to the Eastern District of California.  It also moves pursuant to Rule 12(b)(6) to dismiss the complaint.  The United States moves pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the complaint.

## II.    LEGAL STANDARDS

### A.  Motion to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  Section 1404(a) "does not condition transfer on the initial forum's being

United States District Court
Northern District of California

1  'wrong'. . . [a]nd it permits transfer to any district where venue is also proper . . . or to any other

2  district to which the parties have agreed by contract or stipulation." *Atl. Marine Const. Co. v. U.S.*

3  *Dist. Court*, 134 S. Ct. 568, 579 (2013).

4          When determining whether a transfer is proper, courts employ a two-step analysis.  *Park v.*

5  *Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1093 (N.D. Cal. 2013).  First, courts consider

6  the threshold question of whether the case could have been brought in the forum to which the

7  moving party seeks to transfer the case.  *See id.*; *see also Hatch v. Reliance Ins. Co.*, 758 F.2d 409,

8  414 (9th Cir. 1985).  Once the party seeking transfer has made this showing, district courts have

9  discretion to consider motions to change venue based on an "individualized, case-by-case

10  consideration of convenience and fairness."  *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498

11  (9th Cir. 2000) (internal quotations and citations omitted).

12          Pursuant to Section 1404(a), a court should consider the convenience of the parties, the

13  convenience of the witnesses, and the interest of justice.  28 U.S.C. § 1404(a).  A court may

14  consider additional factors, including "ease of access to the evidence; familiarity of each forum

15  with the applicable law; feasibility of consolidation of other claims; any local interest in the

16  controversy; relative court congestion and time to trial in each forum; location where the relevant

17  agreements were negotiated and executed; the parties' contacts with forum; difference in the costs

18  of litigation in the two forums; and availability of compulsory process to compel attendance of

19  unwilling non-party witnesses."  *Getz v. Boeing Co.*, 547 F. Supp. 2d 1080, 1082 (N.D. Cal. 2008)

20  (citing *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986); *Jones v.*

21  *GNC Franchising, Inc.*, 211 F.3d 495, 498–99 (9th Cir. 2000)).  "No single factor is dispositive,

22  and a district court has broad discretion to adjudicate motions for transfer on a case-by-case basis."

23  *Ctr. for Biological Diversity v. Kempthorne*, No. 08-1339 CW, 2008 WL 4543043, at *2 (N.D.

24  Cal. Oct. 10, 2008) (citing *Stewart Org. Inc. v. Ricoh Corp.,* 487 U.S. 22, 29 (1988); *Sparling v.*

25  *Hoffman Constr. Co., Inc.*, 864 F.2d 635, 639 (9th Cir. 1988)).

26          "Unless the balance of the § 1404(a) factors 'is strongly in favor of the defendants, the

27  plaintiff's choice of forum should rarely be disturbed.'"  *Getz*, 547 F. Supp. 2d at 1082 (quoting

28  *Securities Investor Protection Corp. v. Vigman*, 764 F.2d 1309, 1317 (9th Cir. 1985)).  "The

1    burden is on the defendant to show that the convenience of parties and witnesses and the interest

2    of justice require transfer to another district." *Id.* (citing *Commodity Futures Trading Comm'n v.*

3    *Savage*, 611 F.2d 270, 279 (9th Cir. 1979)).

4        **B.**    **Motions to Dismiss**

5            **1.**    **Rule 12(b)(1)**

6        A motion to dismiss filed pursuant to Rule 12(b)(1) is a challenge to the court's subject

7    matter jurisdiction. *See* Fed. R. Civ. P. 12(b)(1). A court will dismiss a party's claim for lack of

8    subject matter jurisdiction "only when the claim is so insubstantial, implausible, foreclosed by

9    prior decisions of th[e Supreme] Court, or otherwise completely devoid of merit as not to involve

10   a federal controversy." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (citation

11   and quotation marks omitted); *see* Fed. R. Civ. P. 12(b)(1). The challenging party may make a

12   facial or factual attack challenging subject matter jurisdiction. *White v. Lee*, 227 F.3d 1214, 1242

13   (9th Cir. 2000). A facial challenge asserts that "the allegations contained in a complaint are

14   insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d

15   1035, 1039 (9th Cir. 2004). In contrast, a factual attack disputes "the truth of the allegations that,

16   by themselves, would otherwise invoke federal jurisdiction." *Id.* at 1039. A factual challenge

17   permits the court to look beyond the complaint, without "presum[ing] the truthfulness of the

18   plaintiff's allegations." *White*, 227 F.3d at 1242 (citation omitted). Even the presence of disputed

19   material facts "will not preclude the trial court from evaluating for itself the merits of

20   jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (citations

21   omitted).

22           **2.**    **Rule 12(b)(6)**

23       A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in

24   the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

25   When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all

26   of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a

27   claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual

28   matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*,

622 F.3d 1035, 1041 (9th Cir. 2010) (quotation marks omitted) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)).  A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

Taken together, *Iqbal* and *Twombly* require well-pleaded facts, not legal conclusions, that "plausibly give rise to an entitlement to relief.  *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (quotations and internal citations omitted).

As a general rule, a court may not consider "any material beyond the pleadings" when ruling on a Rule 12(b)(6) motion.  *Lee*, 250 F.3d at 688 (citation and quotation marks omitted). However, "a court may take judicial notice of 'matters of public record,'" *id*. at 689 (citing *Mack v. S. Bay Beer Distrib*., 798 F.2d 1279, 1282 (9th Cir. 1986)), and may also consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading," without converting a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment.  *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994), *overruled on other grounds by Galbraith*, 307 F.3d at 1125-26.  The court need not accept as true allegations that contradict facts which may be judicially noticed.  *See Mullis v. U.S. Bankr*. *Court*, 828 F.2d 1385, 1388 (9th Cir. 1987).

## III.    GEO'S MOTION TO TRANSFER

GEO moves to transfer the case, arguing that venue is proper in the Eastern District of California where Sanchez Brito was detained, and that the balance of relevant factors weighs in favor of litigating in that forum.  Mot. 5-6.

Lopez opposes transfer.  She argues it is "unlikely" that she could have brought all three of her FTCA claims against the United States in the Eastern District under the FTCA's venue provision, 28 U.S.C. § 1402.  Opp'n 3.  In an FTCA action, venue is proper "only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred."  28

United States District Court
Northern District of California

U.S.C. § 1402(b).  Lopez is domiciled in Marin County, which is in this district.  *See* Compl. ¶ 13.

Additionally, Lopez challenges "act[s] or omission[s]" by the government that occurred in this

district.  Claim one against the United States, false imprisonment, is based in part on Grasso's

arrest of Sanchez Brito based on his "cursory, inadequate, illegal, and incomplete investigation" in

violation of Directive 16001.1.  Lopez alleges that Grasso was stationed at the Marin County Jail,

which is in this district, at the time he conducted his investigation and made the decision to arrest

and detain Sanchez Brito.  *See* Compl. ¶¶ 49, 59, 133.  Claim two against the United States,

negligence, is also based in part on the failure to "adequately investigate [Sanchez Brito's]

citizenship claim prior to ICE taking custody of him," which also occurred in Marin County.  *See*

*id*. at ¶¶ 141, 142(a), (b).  Therefore, Lopez argues, "most if not all of 'the acts or omissions

complained of' regarding" the claim for false imprisonment occurred in this district, as well as

"material aspects of his second claim," and these claims "likely could not have been brought in the

Eastern District of California.  Opp'n 5.[5]

On reply, GEO does not dispute that Lopez's FTCA claims one and two are based in part

on acts or omissions that occurred in this district.  Instead, it contends that "this focus [sic] on one

cause of action and overlooks all the other claims being brough [sic] by Plaintiff against both the

Unites [sic] States and GEO."  Reply 2.  It also argues in a footnote that the false imprisonment

claim against the United States "will likely be dismissed."  *Id*. at 2 n.1.  GEO does not otherwise

address the argument and thus does not satisfy its burden at step one, which examines whether the

case could have been brought in the Eastern District of California.

Even if GEO had met its burden, the court nevertheless concludes that GEO has not shown

that the convenience of parties and witnesses and the interest of justice weigh in favor of transfer

to the Eastern District.  First, "there is a strong presumption in favor of a plaintiff's choice of

forum," *Getz*, 547 F. Supp. 2d at 1082, and Lopez lives in this district.  *See, e.g.*, *Wilbur P.G. v.*

*United States*, No. 4:21-CV-04457-KAW, 2022 WL 3024319, at *3-4 (N.D. Cal. May 10, 2022)

---

[5] The government filed a response to GEO's motion to transfer in which it states that it "consents to the transfer of this action" to the Eastern District.  [Docket No. 17.]  It does not address the FTCA's venue provision.

United States District Court
Northern District of California

(examining transfer issue in FTCA case and finding that the defendant had not made a sufficient showing transfer was warranted where the plaintiffs resided in their forum of choice).  In addition, significant operative facts occurred in this district, including Grasso's allegedly deficient investigation of Sanchez Brito's citizenship and decision to arrest and detain him in purported violation of an ICE directive.  Some of the harmful effects of Defendants' acts, which are also relevant to liability for Lopez's intentional infliction of emotional distress claims, took place in this district.

GEO also argues that "the material fact witnesses" will be employees of GEO and ICE, as well as non-party Wellpath LLC, which it contends "was contracted to provide the medical/psychiatric care to detainees at Mesa Verde." Mot. 3 n.2, 8.  GEO states that these unnamed witnesses "will presumably be located in the Eastern District where they work," and that relevant "documents and materials" are also likely to be located in the Eastern District.  *Id*. at 8.  However, courts "discount[ ] any inconvenience to the parties' employees, whom the parties can compel to testify."  *Getz*, 547 F. Supp. 2d at 1084.  Moreover, "the location of evidence and witnesses . . . is no longer weighed heavily given the modern advances in communication and transportation."  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998).

In sum, the balance of the section 1404(a) factors does not strongly favor transfer.  The court exercises its broad discretion to deny GEO's motion to transfer this case to the Eastern District of California.

## IV.    GEO'S MOTION TO DISMISS

Lopez alleges the following claims against GEO on behalf of V.S.: 1) violation of the Rehabilitation Act, 29 U.S.C. § 794; 2) disability discrimination in violation of the Unruh Act, California Civil Code sections 51, 52; 3) negligence; 4) intentional infliction of emotional distress; 5) violation of detention standards, California Government Code section 7320; and 6) violation of the Bane Act, California Civil Code section 52.1.  GEO moves to dismiss all six claims on the ground that Lopez is an improper Plaintiff and moves to dismiss the Rehabilitation Act and Unruh

11

Act claims (claims one and two) for failure to state a claim.[6]

### A. Lopez's Standing to Bring the Action

Geo argues that Lopez "lacks standing to bring any of the claims raised in a survival action" and is thus an improper plaintiff.  Mot. 8.

Under California law, a cause of action belonging to the decedent "passes to the decedent's successor in interest, . . . and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest."  Cal. Civ. Proc. Code § 377.30; *Tatum v. City & Cty. of San Francisco*, 441 F.3d 1090, 1093 n.2 (9th Cir. 2006) ("Under California law, if an injury giving rise to liability occurs before a decedent's death, then the claim survives to the decedent's estate.  Where there is no personal representative for the estate, the decedent's 'successor in interest' may prosecute the survival action if the person purporting to act as successor in interest satisfies the requirements of California law . . . " (internal citations omitted) (citing Cal. Civ. Proc. Code §§ 377.30, 377.32)).  "An individual's capacity to sue is determined by the law of the individual's domicile."  *Johns v. Cnty. of San Diego*, 114 F.3d 874, 877 (9th Cir. 1997) (citing Fed. R. Civ. P. 17(b)).  "Under California law, an individual under the age of eighteen is a minor . . . [and] may bring suit as long as a guardian conducts the proceedings."  *Id.* (citing California Family Code sections 6502, 6601).

GEO acknowledges the allegation that V.S. is Sanchez Brito's successor in interest.  *See* Compl. ¶ 13.  However, it notes that V.S. is not listed as a plaintiff and argues that Lopez, as V.S.'s guardian, is not "a proper Plaintiff in her own right."  Mot. 8.  GEO's argument is meritless.  Federal Rule of Civil Procedure 17(a) provides that "[a]n action must be prosecuted in the name of the real party in interest" but permits a guardian (among others) to "sue in their own names without joining the person for whose benefit the action is brought."  Fed. R. Civ. P. 17(a)(B).  All claims in this action are alleged by Lopez on V.S.'s behalf in her capacity as his guardian.  *See* Compl. ¶¶ 130, 139, 147, 153, 164, 170, 174, 178, 184.  Accordingly, GEO's motion to dismiss is denied on this ground.

---

[6] GEO does not otherwise challenge the negligence, intentional infliction of emotional distress, violation of detention standards, or Bane Act claims.

B.     **Rehabilitation Act Claim**

The Rehabilitation Act "prohibits a program receiving federal financial assistance from discriminating based on disability." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 650 (9th Cir. 2021) (citing 29 U.S.C. § 794). It provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title." 29 U.S.C. § 794a(a)(2). "A plaintiff bringing a section 504 claim thus must show that (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." *Fraihat*, 16 F.4th at 650) (cleaned up). GEO does not set forth the elements of a Rehabilitation Act claim but appears to challenge only the fourth element by arguing that the Rehabilitation Act does not apply to GEO because it does not receive "federal financial assistance." *See* Mot. 2.

"The Rehabilitation Act covers any program receiving federal funds." *Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938, 942 (9th Cir. 2009). As it applies to private entities, the Rehabilitation Act "draws on Congress's conditional spending power," i.e., its ability "to place conditions on the grant of federal funds." *Id.* at 941 n.3; *see also U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605 (1986) ("Congress limited the scope of [29 U.S.C. § 794] to those who actually 'receive' federal financial assistance because it sought to impose [section 794] coverage as a form of contractual cost of the recipient's agreement to accept the federal funds."). "[P]ayments that include a subsidy constitute 'Federal financial assistance' within the meaning of the Rehabilitation Act." *Jacobson v. Delta Airlines, Inc.*, 742 F.2d 1202, 1209 (9th Cir. 1984). "[T]he Rehabilitation Act covers only the recipients of federal financial assistance and not the recipients of compensatory payments for services." *Logan v. United States*, 103 F.3d 139, at *2 (9th Cir. 1996) (citing *Jacobson*, 742 F.2d 1202).

Lopez does not contend that GEO is a recipient of federal financial assistance based on its contract with ICE to operate detention facilities. Instead, she alleges that "Defendant GEO operates . . . at least one program or activity for ICE for which it receives federal financial

United States District Court
Northern District of California

assistance," including "subsidies GEO receives from the federal government in connection with its so-called 'Voluntary Work Program.'"  Compl. ¶ 155.  She alleges that under the Voluntary Work Program, "the United States authorizes GEO to use the labor of people incarcerated in its facilities, including Mesa Verde, to perform essential work for the operation of the facilities that would otherwise have to be performed by hiring additional staff or contractors in the community at market rates."  *Id.*  Additionally, Lopez alleges that "[t]he United States provides GEO a stipend of at least $1 per day for each such individual."  *Id.*  Lopez alleges that "GEO failed to accommodate Mr. Sanchez Brito's disability by providing access to programs and activities, including but not limited to the work program."  *Id.* at ¶ 160.

GEO disputes that the stipend it receives from the government in connection with the Voluntary Work Program is "equivalent to the receipt of a grant, property at below-market value, or other financial assistance," citing *Paralyzed Veterans*, 477 U.S. at 607 n.11.  Mot. 3.  In *Paralyzed Veterans*, the Supreme Court considered whether the Rehabilitation Act "is applicable to commercial airlines" as "recipients of federal financial assistance."  477 U.S. at 599, 604.  The issue was whether grants of federal funds to airport operators and the federal government's operation of a nationwide air traffic control system are forms of financial assistance to airlines.  *Id.* at 604, 611.  In relevant part, the Supreme Court rejected the argument that airlines are "indirect recipients" of federal aid to airport operators, holding that the Rehabilitation Act "covers those who receive the aid, but does not extend as far as those who benefit from it."  *Id.* at 607.  *Paralyzed Veterans* does not address the issue in this case, which is whether Lopez has adequately alleged that GEO receives federal financial assistance in the form of subsidies for the Voluntary Work Program.[7]

Accepting Lopez's allegations as true, the court concludes that she has adequately alleged that GEO received federal financial assistance via subsidies for the Voluntary Work Program.  *See, e.g., Romero-Garcia v. CoreCivic, Inc.*, No. 4:20-CV-158 (CDL), 2021 WL 2910571, at *4

---

[7] In its reply, GEO cites four cases in which courts dismissed Rehabilitation Act claims against GEO.  Reply 2-3.  These cases are inapposite because none of them analyzed whether GEO received federal financial aid beyond GEO's contractual relationship with the federal government.

1    (M.D. Ga. June 25, 2021) (plaintiff's allegation that operator of detention received federal

2    subsidies through its "Voluntary Work Program" was sufficient to allege that defendant received

3    federal financial assistance for purposes of Rehabilitation Act claim).  The motion to dismiss the

4    Rehabilitation Act claim is denied.[8]

5         **C.     Unruh Act Claim**

6         California Civil Code section 51 provides in relevant part:

7              [a]ll persons within the jurisdiction of this state are free and equal,
               and no matter what their sex, race, color, religion, ancestry, national
8              origin, disability, medical condition, marital status, or sexual
               orientation, are entitled to the full and equal accommodations,
9              advantages, facilities, privileges, or services in all business
               establishments of every kind whatsoever.
10

11   Cal. Civ. Code § 51(b).  "To prevail on [a] disability discrimination claim under the Unruh Civil

12   Rights Act, [a] plaintiff must establish that (1) he was denied the full and equal accommodations,

13   advantages, facilities, privileges, or services in a business establishment; (2) his disability was a

14   motivating factor for this denial; (3) defendants denied plaintiff the full and equal

15   accommodations, advantages, facilities, privileges, or services; and (4) defendants' wrongful

16   conduct caused plaintiff to suffer injury, damage, loss or harm."  *Johnson v. Beahm*, No. 2:11-cv-

17   0294-MCE-JFM, 2011 WL 5508893, at *4 (E.D. Cal. Nov. 8, 2011) (citing California Civil Jury

18   Instructions (BAJI), No. 7.92 (Spring 2009)).

19        GEO moves to dismiss the Unruh Act claim on the grounds that Mesa Verde is not a

20   "business establishment" under the Unruh Act and that the complaint does not allege "intentional

21   willful action targeted to [Sanchez] Brito's disability."  Mot. 7.

22        The Unruh Act prohibits "business establishments" from engaging in intentional

23   discrimination.  *See* Cal. Civ. Code § 51(b).  The California Supreme Court has explained that

24   "the term 'business establishments' [in the Unruh Act] was used in the broadest sense reasonably

25   possible."  *O'Connor v. Village Green Owners Assn.*, 33 Cal. 3d 790, 795 (1983).  "The word

26

27   _____

28   [8] GEO argues in its reply that Lopez "may not receive relief under the Rehabilitation Act for inadequate medical care" and that the court should dismiss this portion of the claim.  Reply 3-4.  The court declines to consider arguments improperly raised for the first time on reply.

United States District Court
Northern District of California

'business' embraces everything about which one can be employed, and it is often synonymous with calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain." *Id*. "[T]he Unruh Act does not apply to correctional facilities per se." *Wilkins-Jones v. Cnty. of Alameda*, 859 F. Supp. 2d 1039, 1049 (N.D. Cal. 2012) (citing *Taormina v. Cal. Dept. of Corrections*, 946 F. Supp 829, 834 (S.D. Cal. 1996)). Nonetheless, in *Wilkins-Jones*, the court considered whether a "for-profit entity that charges [a] County for its services" within a correctional facility "and therefore is engaged in an 'overall function [ ] to protect and enhance . . . economic value'" was covered by the Unruh Act. 859 F. Supp. 2d at 1049 (quoting *O'Connor*, 33 Cal. 3d at 795). The entity at issue contracted with a county "to provide assessments of incoming prisoners and medical care to inmates at" a county jail. 859 F. Supp. 2d at 1043. The court concluded that the entity was covered by the Unruh Act, reasoning that "[b]y providing services for a fee, [the entity] performs a 'customary business function,' through which it serves inmates like Plaintiff," and that "[t]hat customary business function renders it a 'business establishment' under the broad terms of the Unruh Act." *Id*. at 1050 (citing *O'Connor*, 33 Cal. 3d at 796). The court also held that the fact that the entity received its profits from the county and not directly from the inmates it served did not defeat the Unruh Act's application, noting, "[a]s the Ninth Circuit has acknowledged, California courts 'have allowed parties that are not 'clients, patrons or customers' in the traditional sense to bring Unruh Act claims,' so long as the claimant is a 'recipient[ ] of the business establishment's . . . goods, services or facilities.'" *Id*. at 1050 (quoting *Strother v. Southern California Permanente Medical* Group, 79 F.3d 859, 873 (9th Cir. 1996) (quoting *Isbister v. Boys' Club of Santa Cruz, Inc.,* 40 Cal. 3d 72, 83 & n.12 (1985))).

In this case, the complaint alleges that GEO is a "private prison corporation" that contracts with ICE to operate detention facilities. Compl. ¶ 15. Like the entity at issue in *Wilkins-Jones*, the complaint alleges that GEO provides services to detainees pursuant to its contract with ICE, including programming, transportation, medical care, access to phones, access to a library, a work program, and other services. *See id*. at ¶¶ 19, 87, 94, 95. These allegations support a reasonable inference that GEO "functions as a business within" Mesa Verde "whereby it is paid to provide services to inmates," and that by providing such services, GEO "performs a 'customary business

function,' through which it serves inmates like" Sanchez Brito. *See Wilkins-Jones*, 859 F. Supp. 2d at 1050. The court concludes that the complaint sufficiently alleges that GEO is a "business establishment" under the Unruh Act. *See O'Connor*, 33 Cal. 3d at 795 ("the term 'business establishments' [in the Unruh Act] was used in the broadest sense reasonably possible.").

The court also concludes that the complaint contains sufficient allegations supporting a plausible inference that GEO engaged in intentional discrimination against Sanchez Brito based on his disability.[9] The complaint alleges that GEO placed Sanchez Brito in solitary confinement in its Restricted Housing Unit ("RHU") for several "grossly excessive continuous periods" stretching for several months at a time, as well as "a substantial amount of the . . . three years" he spent at Mesa Verde. Compl. ¶¶ 90, 91, 106, 167(a). It alleges that GEO used varying justifications for his placement in solitary confinement, including for "his own protection" and for "disciplinary reasons," and that "[b]eneath all these stated reasons" was the fact that "every time Defendants place him in segregation, it was because of his serious mental illness[.]" *Id.* at ¶ 90. The complaint further alleges that many of the placements in solitary confinement took place after returning him to the general population, after which GEO would place him "back in solitary confinement" due to his "deteriorating mental health." *Id.* at ¶ 91. These allegations are sufficient to allege intentional discrimination based on disability.

GEO's motion to dismiss the Unruh Act claim is denied.

## V.   UNITED STATES'S MOTION TO DISMISS[10]

The claims against the United States are as follows: 1) false imprisonment; 2) negligence;

---

[9] GEO argues that the allegation that Sanchez Brito was denied programs and services "on account of his disability" "is made against all Defendants and does not distinguish between them." Mot. 6 (quoting Compl. ¶ 7). However, there are only two Defendants in the case, one of which is GEO. Thus, allegations against "Defendants" necessarily include GEO.

[10] The government submitted three declarations with its motion to dismiss and argues that the court may consider this evidence in ruling on its Rules 12(b)(1) and 12(b)(6) challenges to the complaint. [Docket Nos. 15-1 (Scott Decl.), 15-2 (Choe Decl.), 15-3 (Gilbert Decl.).] Its argument on this point is thin and it does not address each individual document attached to the declarations. *See* Mot. 3 n.3, 9 n.7. Lopez objects to the court's consideration of this evidence. Opp'n 1-2, 4, 5 n.1. With respect to the Gilbert Declaration, to which materials related to Sanchez Brito's release from custody are attached, the government's request to consider these materials is denied as moot since Lopez concedes the claim for negligence based on Sanchez Brito's release as discussed below. With respect to the Scott and Choe Declarations, to which materials from

17

United States District Court
Northern District of California

1    and 3) intentional infliction of emotional distress.  The government moves to dismiss the claims

2    for lack of subject matter jurisdiction based on sovereign immunity.  It also moves to dismiss the

3    claims pursuant to Rule 12(b)(6) as barred in whole or in part by the statute of limitations and

4    inadequately pleaded.

5         **A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction**

6         "The United States can be sued only to the extent that it waives its sovereign immunity

7    from suit." *Cervantes v. United States*, 330 F.3d 1186, 1188 (9th Cir. 2003).  "Absent a waiver,

8    sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v.*

9    *Meyer*, 510 U.S. 471, 475 (1994) (citations omitted).  "Sovereign immunity is jurisdictional in

10   nature.  Indeed, the 'terms of [the United States'] consent to be sued in any court define that

11   court's jurisdiction to entertain the suit.'" *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584,

12   586 (1941)).  The FTCA provides a limited waiver of the government's sovereign immunity for

13   certain torts committed by its employees:

> [T]he district courts . . . shall have exclusive jurisdiction of civil
> actions on claims against the United States, for money damages, . . .
> for injury or loss of property, or personal injury or death caused by
> the negligent or wrongful act or omission of any employee of the
> Government while acting within the scope of his office or
> employment, under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance with the
> law of the place where the act or omission occurred.

19   28 U.S.C. § 1346(b)(1); *see also* 28 U.S.C. § 2674 ("The United States shall be liable . . . in the

20   same manner and to the same extent as a private individual under like circumstances[.]").  The

21   FTCA waiver is subject to certain exceptions enumerated in 28 U.S.C. § 2680, "a statutory

22   reservation of sovereign immunity for a particular class of tort claims." *Cervantes*, 330 F.3d at

23   1188 (quoting *Gager v. United States,* 149 F.3d 918, 920 (9th Cir. 1998)).  "Where a § 2680

24   exception applies, the United States has not waived its immunity from suit, and a court lacks

25   jurisdiction over such claims."

26

27   ──────────────

28   Sanchez Brito's immigration proceedings are attached, the court declines to consider these
     materials as the government does not sufficiently explain how they are either subject to judicial
     notice or incorporated by reference into the complaint.

"The FTCA specifies that the liability of the United States is to be determined in accordance with the law of the place where the allegedly tortious act or omission occurred." *Tekle v. United States*, 511 F.3d 839, 844 (9th Cir. 2007) (quoting 28 U.S.C. § 1346(b)) (cleaned up). Accordingly, California law governs the United States's liability for Lopez's claims. *See id.* (citing *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004)).

### 1. False Imprisonment Claim

The elements of a claim for false imprisonment under California law are: "(1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1169 (9th Cir. 2011) (quotation and citation omitted). With respect to element two, "without lawful privilege," a law enforcement officer is not liable for false imprisonment arising out of an arrest if "[t]he arrest was lawful" or the officer "at the time of the arrest, had reasonable cause to believe the arrest was lawful." Cal. Pen. Code § 847(b)(1).

There are two disputed threshold issues. First, Lopez contends that California Penal Code section 847 does not apply, arguing that the false imprisonment claim must be analyzed under a private person standard—in other words, Lopez asserts that the court should use the standard for a citizen's arrest instead of the standard in section 847 which applies to California law enforcement officers. According to Lopez, Ninth Circuit authority holding that section 847 applies to claims of wrongful arrest by federal officers has been overruled, as follows. In *Cervantes*, the Ninth Circuit applied California Penal Code section 847(b) to customs agents when evaluating FTCA claims for false arrest and false imprisonment. 330 F.3d at 1188. One year later, in *Galvin*, protesters brought FTCA claims for false arrest against Federal Park Police officers. 374 F.3d at 743, 758. *Galvin* noted that "[i]n general, the United States is liable 'to the same extent as a private individual under like circumstances,'" but observed that it had previously held that "[law enforcement] obligations make the law of citizen arrests an inappropriate instrument for determining FTCA liability." *Id.* at 758 (quoting 28 U.S.C. § 2674; *Arnsberg v. United States*, 757 F.2d 971, 979 (1985)). Accordingly, citing *Cervantes*, *Galvin* concluded that the government was not liable under the FTCA for the false arrest and false imprisonment claims under California

United States District Court
Northern District of California

Penal Code section 847(b)(1) because the officers "had reasonable cause to believe the arrest was lawful." *Id.*

Lopez then argues that *Galvin* was "effectively overruled" by *Tekle*. Opp'n 7; Pl.'s Supp. Br. 1-2. *Tekle* is a split decision. Plaintiff relies on a portion of Judge Tashima's opinion that expressly "does not constitute part of the majority opinion." *Tekle*, 511 F.3d at 850 n.7. In the excerpt cited by Plaintiff, Judge Tashima wrote that recent Supreme Court authority required the court "to examine the law regarding the liability of a private person for false arrest" and other claims and applied California law regarding a citizen's arrest to an FTCA claim of false arrest. 511 F.3d at 853-54 (citing *United States v. Olson*, 546 U.S. 43, 44-47 (2005)). Given the limited effect of that portion of *Tekle*, *Cervantes* and *Galvin* remain binding on this court and the court must evaluate the false arrest claim under California Penal Code section 847(b)(1). *See also Michel v. United States*, No. 16 CV 277-GPC (AGS), 2017 WL 5067608, at *10-12 (S.D. Cal. Oct. 31, 2017) (recognizing that *Tekle* "provides no binding authority for this Court to apply the law of citizen's arrest to Plaintiff's false imprisonment claim against federal border control agents" and applying state law enforcement privilege to the false arrest claim).

The second threshold issue is the scope of the false imprisonment claim alleged in the complaint. At the hearing, Lopez argued that the claim is based on two distinct theories of false imprisonment: first, that Grasso unlawfully arrested Sanchez Brito without probable cause; and second, that Grasso and other ICE agents unlawfully continued Sanchez Brito's detention without probable cause for years despite receiving evidence that he was born in the United States. Lopez cannot maintain two separate false imprisonment claims on Sanchez Brito's arrest and imprisonment. "Under California law, the torts of false arrest and false imprisonment are not separate torts, as false arrest is 'but one way of committing a false imprisonment.'" *Watts v. Cnty. of Sacramento*, 256 F.3d 886, 891 (9th Cir. 2001) (quoting *Asgari v. City of Los Angeles*, 15 Cal. 4th 744, 753 n.3 (1997)); *Moore v. City & Cnty. of San Francisco*, 5 Cal. App. 3d 728, 735 (1970) ("since an arrest involves detention or restraint, false arrest always involves an imprisonment, and a suit for false imprisonment automatically embraces the wrongful arrest; and two separate torts are not involved . . . a person who is falsely arrested is at the same time falsely imprisoned"). A

1
2
3
4
5
6
7

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

claim for "false imprisonment based on unlawful arrest will lie where there was an arrest without process followed by imprisonment," *Watts*, 256 F.3d at 891 (citations omitted), and once a person's confinement is "pursuant to lawful process" it no longer constitutes false imprisonment. *Asgari*, 15 Cal. 4th at 757 (holding that "[p]laintiff's false imprisonment ended when he was arraigned in municipal court on the felony complaint seven days after he was arrested.  At that point, plaintiff's confinement was pursuant to lawful process and no longer constituted false imprisonment.").

At the hearing, Lopez was unable to offer authority supporting her position that she may bring a false arrest claim based on Sanchez Brito's arrest and a separate false imprisonment claim based on his continued incarceration.  Accordingly, the court construes the claim as a false imprisonment claim based on Grasso's allegedly unlawful arrest of Sanchez Brito.

### a.    Whether a Law Enforcement Officer Would Be Liable Under State Law for Arresting Sanchez Brito

The government asserts that it has immunity from the false imprisonment claim because a law enforcement officer would not have liability under California law for arresting Sanchez Brito. *See* 28 U.S.C. § 1346(b)(1).  According to the government, there was reasonable cause for the arrest under California Penal Code section 847(b)(1).  Mot. 12-13.  *See Galvin*, 374 F.3d at 758 (affirming dismissal of FTCA false arrest claim where officers "had reasonable cause to believe the arrest [of plaintiffs] was lawful" under section 847(b)(1)); *Michel*, 2017 WL 5067608, at *8 ("if there was probable cause to arrest [plaintiff], there can be no liability for false arrest.").

"California courts speak of 'reasonable cause' and 'probable cause' interchangeably[.]" *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 786 (2017).  "Probable cause exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio,* 379 U.S. 89, 91 (1964)).  "Alternatively, [the Ninth Circuit] has defined probable cause as follows: when 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed

a crime.'"  *Id.* (citing *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)) (alteration in

original); *Hamilton v. City of San Diego*, 217 Cal. App. 3d 838, 844 (1990) ("Probable cause for

an arrest is shown if a man of ordinary caution or prudence would be led to believe and

conscientiously entertain a strong suspicion of the guilt of the accused.  Probable cause may exist

even though there may be some room for doubt." (citations omitted)).  "Probable cause must be

determined at the time the arrest is made."  *Allen v. City of Portland*, 73 F.3d 232, 236 (9th Cir.

1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 482 (1963)).

   The government contends that Grasso had probable cause to arrest Sanchez Brito based

solely on the allegation that "Grasso had obtained a delayed Mexican birth registration regarding

Mr. Sanchez Brito" at the time of the arrest.  Mot. 13 (citing Compl. ¶ 51).  However, Lopez

alleges that the Mexican birth registration "had significant and obvious defects on its face that

undermined its reliability as proof of Mexican birth," including that the registration was made by

Sanchez Brito's grandmother, not his parents; the document stated that his parents were not

present at the registration; and the document was created three months after Sanchez Brito's actual

birth.  Compl. ¶¶ 51-53.  Lopez further alleges that there were other problems with the document

and that "Officer Grasso did not even speak or read Spanish well enough to understand the defects

in the Spanish-language document."  *Id.* at ¶ 55.  Resolution of whether Grasso had probable cause

to arrest Sanchez Brito is not appropriate on a motion to dismiss, where the government relies on

the Mexican birth registration to establish probable cause and the complaint alleges that the

document was "insufficiently probative" of Sanchez Brito's actual place of birth.  *See id.* at ¶ 60.

*See, e.g., Plascencia v. United States*, No. EDCV 17-02515 JGB SPX, 2018 WL 6133713, at *9

(C.D. Cal. May 25, 2018) (holding that "a motion to dismiss is not the appropriate time to

determine reasonableness" of an arrest where plaintiff alleged arresting officers lacked probable

cause and her detention was unreasonable).  The motion to dismiss is denied on this ground.

### b.   Intentional Torts Exception

   The government next argues that the false imprisonment claim is barred under the

intentional torts exception to the waiver of sovereign immunity, 28 U.S.C. § 2680(h).  Mot. 15.

That exception "preserves the Government's immunity from suit for '[a]ny claim arising out of

assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights,'" *Millbrook v. United States*, 569 U.S. 50, 52 (2013) (citing 28 U.S.C. § 2680(h), but waives immunity for claims arising out of "assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution" committed by "investigative or law enforcement officers." 28 U.S.C. § 2680(h). The statute defines "investigative or law enforcement officer" to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." *Id.*

On reply, the government concedes that Grasso is a law enforcement officer and that the intentional torts exception does not apply to him. *See* Reply 7-8. Accordingly, the motion to dismiss is denied on this ground.

### c.   Discretionary Function Exception

The government argues that the false imprisonment claim is barred by the discretionary function exception that "precludes claims against the United States which are based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion was abused.'" *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000) (quoting 28 U.S.C. § 2680(a)).

To determine whether the discretionary function exception applies, courts engage in a two-step inquiry. First, (1) "the court must determine whether the challenged conduct involves an element of judgment or choice." *Nurse*, 226 F.3d at 1001 (citing *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Second, "if the conduct involves some element of choice, the court must determine whether the conduct implements social, economic or political policy considerations." *Nurse*, 226 F.3d at 1001 (citing *Gasho v. United States*, 39 F.3d 1420, 1435 (9th Cir. 1994)). "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536. "The exception similarly does not apply where a federal official violates the constitution."

United States District Court
Northern District of California

*J.A.M. v. United States*, No. 22-CV-380-GPC-BGS, ---F. Supp. 3d---, 2024 WL 3353594, at *8, *11 (S.D. Cal. June 21, 2024) (holding discretionary function exception did not bar false imprisonment and related claims because plaintiffs' detention "was unreasonable and violated the Fourth Amendment") (citing *Galvin*, 374 F.3d at 758); *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021) ("[e]ven if the agents' actions involved elements of discretion, agents do not have discretion to violate the Constitution."). "The government has the burden of proving that the discretionary function exception applies." *J.A.M.*, 2024 WL 3353594, at *8 (citation omitted).

"Under the Fourth Amendment, a warrantless arrest requires probable cause." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Michigan v. Summers*, 452 U.S. 692, 700 (1981)). Here, Lopez disputes whether probable cause supported Grasso's arrest of Sanchez Brito for being a non-citizen, alleging that the Mexican birth registration was "insufficiently probative" of Sanchez Brito's actual birthplace and that Grasso acted "without lawful privilege." *See id.* at ¶¶ 60, 133, 135. Given the dispute about whether Sanchez Brito's arrest was without probable cause and thus violated the Fourth Amendment, the court denies the motion to dismiss the false imprisonment claim based on the discretionary function exception. *See, e.g., Plascencia*, 2018 WL 6133713, at *9 (denying motion to dismiss claims based on unlawful arrest pursuant to discretionary function exception; reasoning "at this stage of the proceeding, the Court cannot determine whether a constitutional violation occurred"); *Galvin*, 374 F.3d at 758.

### d.    Due Care Exception

Finally, the government argues that the due care exception bars the false imprisonment claim. Mot. 18. Under 28 U.S.C. § 2680(a), the government is not liable for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid." According to the government, ICE is "statutorily mandated by federal law to detain" "noncitizens who had committed aggravated felonies" under 8 U.S.C. § 1226(c), and to continue Sanchez Brito's detention after the immigration judge "issued an order finding that [Sanchez Brito] was a noncitizen and had committed an aggravated felony, and the BIA issued an order affirming the same." Mot. 17.

1   With respect to Grasso's arrest of Sanchez Brito, 8 U.S.C. § 1226(c) provides in relevant

2   part that "[t]he Attorney General *shall* take into custody any alien who . . . is deportable by reason

3   of having committed" an "aggravated felony."  *See* 8 U.S.C. § 1226(c) (emphasis added); 8 U.S.C.

4   § 1227(a)(2)(A)(iii).  However, the gravamen of this claim is that Grasso unlawfully arrested

5   Sanchez Brito as a non-citizen "without lawful privilege," i.e., without probable cause, even

6   though Sanchez Brito was born in the United States.  "[T]he due care exception applies only when

7   an official was 'reasonably executing the mandates of' a statute or regulation." *C.M. v. United*

8   *States*, No. CV-19-05217-PHX-SRB, 2020 WL 1698191, at *3 (D. Ariz. Mar. 30, 2020) (quoting

9   *Welch v. United States*, 409 F.3d 646, 651 (4th Cir. 2005)).  On reply, the government does not

10  address this argument and focuses only on whether the due care exception applied after the 2017

11  decision by the immigration judge on removal and BIA affirmance of the same.  Reply 10.  Given

12  the disputes about the lawfulness of Grasso's arrest of Sanchez Brito, the court denies the motion

13  to dismiss the false imprisonment claim based on the due care exception.

14  **2.    Negligence Claim**

15  The second claim is for negligence.  The negligence claim is based on two theories: 1) that

16  ICE agents breached their duty to release Sanchez Brito once they became aware of probative

17  evidence of his U.S. citizenship (the "failure-to-release theory"); and 2) that ICE agents breached

18  their duty to protect Sanchez Brito "from harsh conditions of confinement known to cause

19  substantial risk of serious harm, including prolonged solitary confinement" (the "conditions of

20  confinement theory").  Opp'n 15-16; Compl. ¶¶ 137-44.[11]  The government argues that the United

21  States is immune from both negligence theories.

22  **a.    Failure to Release**

23  With respect to the failure-to-release theory of negligence, Lopez argues that regardless of

24  whether Sanchez Brito's imprisonment was "permissible at its inception, ICE officers had an

25  ongoing duty to ensure they continued to have lawful authority to keep him in custody,"

26  _____

27  [11] The government moves to dismiss the negligence claims based on California juvenile records laws and the circumstances of Sanchez Brito's release from custody.  Mot. 19, 21-22; *see* Compl.

28  ¶ 142(c), (i).  Lopez does not address these theories and thus concedes them.  They are dismissed without leave to amend.

particularly as soon as ICE implemented Directive 16001.2 in November 2015. Opp'n 16. According to Lopez, by the time ICE implemented Directive 16001.2, Lopez had testified under oath at an immigration hearing regarding the circumstances of Sanchez Brito's birth in California, including testifying that she had never seen the delayed Mexican birth registration and had not signed it, among other subjects. *See id.* at 16 (citing Compl. ¶¶ 69-70). Accordingly, she argues, this was not a case in which there was "no probative evidence" of U.S. citizenship. She goes on to recount the history of the immigration proceedings, arguing that "[a]ny reasonable person . . . would have understood that this was not a case in which there was 'no probative evidence' of U.S. citizenship. *Id.* at 17-18. Nonetheless, ICE continued to detain Sanchez Brito, allegedly in violation of Directive 16001.2. The government argues that it has immunity from this claim because a private person would not be liable under state law for failing to comply with ICE directives.

Under the FTCA, the United States may be liable in tort if a private person would be liable to the plaintiff "in accordance with the law of the place." 28 U.S.C. § 1346(b). The Ninth Circuit has instructed that the reference to the "law of the place" means "law of the State—the source of substantive liability under the FTCA." *Delta Savings Bank v. United States*, 265 F.3d 1017, 1024 (9th Cir. 2001) (quoting *FDIC v. Meyer*, 510 U.S. 471, 478 (1994)). A duty arising from federal law cannot sustain a claim under the FTCA. *See id.* Lopez does not address this binding authority. Instead, she cites two cases that she contends support basing an FTCA claim on violations of ICE directives, *Makowski v. United States*, 27 F. Supp. 3d 901, 918 (N.D. Ill. 2014), and *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1271-72, 1286-89, 1298 (M.D. Ga. 2012). *See* Opp'n 19. Both are distinguishable and neither supports her position.

In *Makowski*, the plaintiff alleged a false imprisonment claim against the United States after being detained pursuant to an immigration detainer even though he presented his U.S. passport and social security card to an ICE officer. 27 F. Supp. 3d at 908, 917-918. The court discussed the existence of an ICE memorandum "directing officers and agents to 'immediately examine the merits of [a] claim' of U.S. citizenship by a detained individual" and to prepare a recommendation on the claim within 24 hours and noted that "no prompt recommendation and

decision resulted from [the plaintiff's] citizenship claim." *Id*. at 918.  The court ultimately concluded that the plaintiff had stated a plausible claim for false imprisonment, citing Seventh Circuit law holding that "[t]he continuation of even a lawful arrest violates the Fourth Amendment when the police discover additional facts dissipating their earlier probable cause." *Id*. (citation omitted).  Similarly, in *Lyttle*, ICE agents detained the plaintiff and issued an expedited removal order despite receiving copies of his U.S. passport and adoption papers.  867 F. Supp. 2d at 1273.  While the court discussed ICE directives in place at the time of the detention that provided that "probable cause must exist for the warrantless detention" of persons claiming U.S. citizenship, *id*. at 1287-89, it ultimately held that the plaintiff stated a claim for false imprisonment based on lack of probable cause, not violation of the ICE directives.  *Id*. at 1298.  Neither case addressed negligence claims based on ICE directives, and neither holds that a violation of ICE directives is sufficient to state any FTCA claim.

As Lopez has failed to show that the failure-to-release negligence claim may be premised on a violation of ICE directives, she "must show that the conduct of the government violates some state law." *See Delta Sav. Bank*, 265 F.3d at 1025.  Lopez argues that under California law, law enforcement officers have an "ongoing duty to ensure [that] lawful authority for imprisonment remains," citing *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1380 (9th Cir. 1998).  Opp'n 18. In *Martinez*, the plaintiff was arrested and held in Mexico for 59 days for a murder committed in Los Angeles; he was innocent of the crime.  141 F.3d at 1376.  Following his arrest the plaintiff repeatedly denied that he was the suspect and provided evidence of the same.  After his release from custody, he sued the city of Los Angeles and the Los Angeles Police Department for false imprisonment, negligence, and other claims, alleging that LAPD officers "acted negligently in conducting the investigation to verify that he was the correct suspect." *Id*. at 1377-79.  The Ninth Circuit affirmed summary judgment on the plaintiff's false arrest claim against the LAPD because no one acting under the direction of the LAPD arrested him; rather, he was "arrested in Mexico by Mexican police pursuant to an apparently valid Mexican warrant." *Id*. at 1380.  The court then turned to his claim that the LAPD "falsely imprisoned him by allowing him to remain in jail in Mexico after the LAPD knew or should have known that he was not the true suspect."  The court

noted that under California law, "[a] jailer, and derivatively the public entity which employs the jailer, may be liable if the jailer knows that the imprisonment is unlawful or if there is 'some notice sufficient to put him, as a reasonable man, under a duty to investigate the validity of the incarceration.'" *Id*. (quoting *Sullivan v. Cnty. of Los Angeles*, 12 Cal. 3d 710, 719 (1974) (a claim for false imprisonment may arise if a person is "deprived of his liberty after his jail term ends."). The court held that "a special relationship existed between the LAPD and [the plaintiff]" and that there were genuine issues of material fact regarding the false imprisonment claim based on prolonged detention. *Id*. at 1380-81.

The court then analyzed the negligence claim, which was based on the same facts as the false imprisonment claim based upon the prolonged detention. It held that "a jailer has a duty to investigate the validity of an incarceration after sufficient notice" and that the plaintiff had "presented evidence of negligence sufficient to create a genuine issue of material fact as to [the] claim." *Id*. (citing *Sullivan*, 12 Cal. 3d at 719). *Martinez* thus supports the proposition that law enforcement officers have "a duty to investigate the validity of an incarceration after sufficient notice." The government does not accurately characterize *Martinez* and does not meaningfully address its holding with respect to negligence. *See* Reply 12-13 ("What Plaintiff's cases actually say is that California law provides is that a jailer may have liability 'if a person is deprived of his liberty after his jail term ends.'" (citing *Martinez*, 141 F.3d at 1380)).

On reply, the government also argues that a law enforcement officer would not be liable for the claim because California Penal Code section 847(b)(1)'s "liability bar applies to all claims arising out of an alleged false imprisonment, including claims recast as negligence." Reply 13 n.10. Their two cited cases are distinguishable. In *Herwick v. Budget Rent A Car Sys. Inc.*, No. CV 10-00409 SJO (PLAx), 2011 WL 13213607, at *12 (C.D. Cal. Mar. 8, 2011), the court held that the LAPD was immune from liability for a negligence claim based on failure to further investigate under section 847(b)(1) before incarcerating the plaintiffs because it had "already held that there was probable cause" supporting the plaintiffs' arrest. In *Beed v. Cnty. of Los Angeles*, No. CV 06-1236 GAF (PLAx), 2007 WL 9734434, at *4-5 (C.D. Cal. Mar. 20, 2007), the court held the defendant was immune under section 847(b)(1) and other state law immunities for various

claims "alleg[ing] a wrongful detention" where the plaintiff was arrested pursuant to a warrant that she did not challenge. These cases are distinguishable from this case, where the court has found that the question of whether Sanchez Brito's arrest was supported by probable cause is disputed and not amenable to resolution on a motion to dismiss.

Accordingly, the motion to dismiss the failure-to-release negligence claim is denied on the ground that a private person would not be liable for the claim under state law. *See Martinez*, 141 F.3d at 1381.

The government also argues that the claim is barred by the intentional torts, discretionary function, and due care exceptions to the FTCA waiver but does not actually analyze those exceptions as applied to the failure-to-release negligence claim. *See* Mot. 18-19. The court cannot analyze arguments that a party fails to develop. Accordingly, the motion to dismiss this claim based on sovereign immunity is denied.

### b.     Conditions of Confinement

With respect to the negligence claim based on conditions of confinement, the government argues that it is immune because the FTCA does not waive immunity with respect to acts or omissions of contractors like GEO. *See* 28 U.S.C. § 2671 (defining "employee of the government" for purposes of section 1346(b) and excluding "any contractor with the United States"). It contends that the complaint makes several allegations against "Defendants" collectively, and that the only allegation against ICE is that it "eventually began to conduct limited review of Mr. Sanchez Brito's extended solitary confinement" but that the "cursory, rubber-stamp review did not comply with" ICE's written policies. Mot. 19 (citing Compl. ¶ 100).

This single allegation regarding ICE's actions does not overcome the United States's immunity. First, it is made only against ICE as an institution, not a natural-person government employee. As used in the FTCA, "employee of the government" refers only to natural persons. *Adams v. United States*, 420 F.3d 1049, 1053-55 (9th Cir. 2005); *J.P. v. United States*, No. CV-22-00683-PHX-MTL, 2023 WL 4237331, at *3 (D. Ariz. June 28, 2023) ("claims . . . based on acts or omissions of institutions, rather than individuals, are not cognizable under the FTCA.").

Second, whether a detainee should be placed in solitary confinement is inherently a

United States District Court
Northern District of California

government function, and no FTCA liability exists for government functions "that private persons could not engage in and hence could not be liable for under local law." *Sky Ad, Inc. v. McClure*, 951 F.2d 1146, 1147 n.2 (9th Cir. 1991). *See, e.g., Adeboye v. United States*, No. 19-CV-3089 (DLF), 2020 WL 5231323, at *2 (D.D.C. Sept. 1, 2020) (negligence claim based on "failure to take reasonable care in calculating [plaintiff's] release date" from prison barred by sovereign immunity; "[t]he authority to detain other persons . . . has no private analogue.").

Lopez does not respond to the foregoing authority and does not cite any cases supporting the theory that a private person would be liable for a negligence claim based on conditions of confinement under state law. *See* Opp'n 21. The court concludes that sovereign immunity bars the conditions of confinement negligence claim. It is dismissed without leave to amend.

### 3. Intentional Infliction of Emotional Distress Claim

Lopez's third claim against the government is for intentional infliction of emotional distress. The government argues that this claim is barred by sovereign immunity for the same reasons as the negligence claim but does not actually offer any analysis of the claim or cite cases specific to intentional infliction of emotional distress. *See* Mot. 22. The motion to dismiss this claim based on sovereign immunity is denied.

### B. Failure to State a Claim

#### 1. False Imprisonment Claim

The government moves to dismiss the false imprisonment claim as time-barred in its entirety. Mot. 22.

The FTCA requires plaintiffs to file an administrative claim within two years of when their claim accrues. If they do not, their claim is time barred. *Dyniewicz v. United States*, 742 F.2d 484, 485 (9th Cir. 1984) (citing 28 U.S.C. § 2401(b)). 28 U.S.C. § 2401(b) is "a nonjurisdictional claim-processing rule subject to the presumption in favor of equitable tolling." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1047 (9th Cir. 2013). "The date on which an FTCA claim accrues is determined by federal law." *Bartleson v. United States*, 96 F.3d 1270, 1276 (9th Cir. 1996). An FTCA claim "accrues when a plaintiff knows that he has been injured and who has inflicted the injury." *Winter v. United States*, 244 F.3d 1088, 1090 (9th Cir. 2001).

United States District Court
Northern District of California

As discussed above, Lopez's false imprisonment claim is based on Grasso's allegedly unlawful arrest of Sanchez Brito.  In *Wallace v. Kato*, 549 U.S. 384, 389 (2007), the Supreme Court held that as "false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process—when, for example, he is bound over by a magistrate or arraigned on charges."  Therefore, the statute of limitations on a claim for false imprisonment begins to run once the plaintiff is detained pursuant to legal process.  *See id.*; *accord Asgari*, 15 Cal. 4th at 757 (false imprisonment ends once confinement is pursuant to legal process); *West v. City of Mesa*, 594 F. App'x 923, 924 (9th Cir. 2014) (plaintiff's false imprisonment claim accrued "when his detention was validated by legal process"); *see also Dural v. City & Cnty. of Honolulu*, 658 F. Supp. 3d 855, 865 (D. Haw. 2023) (noting that "[f]ederal courts of appeals applying *Wallace* have ruled that a claim for false imprisonment begins to accrue once the plaintiff becomes detained pursuant to legal process," citing *Mills v. City of Covina*, 921 F.3d 1161, 1166 (9th Cir. 2019); *Martin v. Julian*, 18 F.4th 580, 583 (8th Cir. 2021)).

Here, the government argues that the false imprisonment claim accrued in May 2015, when Sanchez Brito first appeared before an immigration judge, or at the latest, by January 30, 2017, when an immigration judge found that Sanchez Brito was a noncitizen and ordered him removed.  Mot. 23 (citing Compl. ¶¶ 66, 75).  *See, e.g., Watson v. United States*, 865 F.3d 123, 131 (2d Cir. 2017) (immigration detainee's false imprisonment claim accrued when he was "held pursuant to legal process," which occurred at least when an immigration judge ordered his removal).  Lopez conceded at the hearing that pursuant to *Watson*, the false imprisonment claim based on false arrest accrued when an immigration judge ordered Sanchez Brito removed, which was in January 2017.[12]  Lopez filed an administrative tort claim on November 29, 2022, Compl. ¶ 16, which was

---

[12] Lopez also argued that to the extent she may bring a separate false imprisonment claim based on Sanchez Brito's incarceration, separate from his arrest, the claim did not accrue until he was released, citing *Gonzalez v. United States*, No. CV-12-01912 DMG (DTBx), 2013 WL 942363, at *8 (C.D. Cal. Mar. 11, 2013) (holding FTCA false imprisonment claim based on lengthy immigration detention had not yet accrued at the time of release because the lawfulness of the detention had not been decided).  The government argues that *Gonzalez* is no longer persuasive since the Ninth Circuit's decision in *Mills v. Covina*, 921 F.3d 1161, 1166 (9th Cir. 2019), in which the court held that the plaintiff's 42 U.S.C. § 1983 claims for unlawful detention, false

United States District Court
Northern District of California

more than two years after the false arrest claim accrued.  Accordingly, the false imprisonment

claim based on false arrest is untimely.  The court cannot determine that amendment is futile.

Therefore, this claim is dismissed with leave to amend.[13]

### 2.     Failure-to-Release Negligence Claim

The government argues that Lopez fails to plead a cognizable negligence claim.  Mot. 24-25.

"A plaintiff in a negligence suit must demonstrate 'a legal duty to use due care, a breach of

such legal duty, and the breach as the proximate or legal cause of the resulting injury.'"  *Vasilenko*

*v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017).  Here, while the complaint alleges that

unnamed "Agents of the United States" breached various duties to Sanchez Brito, it does not

sufficiently specify the identity or role of any individual Defendant in the alleged wrongdoing.

While Lopez "may refer to unknown defendants as 'Does' at this stage, she must nevertheless

allege specific facts showing how each particular doe defendant violated [her] rights."  *See*

*Thomas on behalf of Thomas v. Cnty. of San Diego*, No. 20-CV-1979-CAB-MDD, 2021 WL

2715086, at *3 (S.D. Cal. July 1, 2021) (citations omitted).  As the complaint does not clearly link

any alleged negligent act to any specific individual actor, the court cannot "draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *See Iqbal*, 556 U.S. at 678.

Accordingly, the complaint fails to state a claim for negligence based on a failure-to-release

theory.

The government also argues that the claim is time barred with respect to any acts or

omissions prior to November 29, 2020, which is two years before Lopez filed the administrative

tort claim.  Mot. 23.  As the complaint fails to state a negligence claim, the court does not reach

the government's argument that the claim is time-barred.  The failure-to-release negligence claim

---

arrest, false imprisonment, and related claims accrued at the time of his arrest.  The court need not
resolve this dispute since it has already held that Lopez may not bring a false imprisonment claim
based on the incarceration, independent of the arrest.

[13] The government also argues that the false imprisonment claim should be dismissed because
Grasso had "reasonable cause to arrest" Sanchez Brito.  Mot. 24.  Given the parties' dispute
regarding whether reasonable or probable cause supported the arrest, the motion to dismiss on this
point is denied.

1   is dismissed with leave to amend.

2              **3.      Intentional Infliction of Emotional Distress Claim**

3              The government argues that Lopez fails to plead a cognizable intentional infliction of

4   emotional distress claim.  It also argues that the claim is time barred with respect to any acts or

5   omissions prior to November 29, 2020, which is two years before Lopez filed the administrative

6   tort claim.  Mot. 23-25.

7              In order to establish a claim for intentional infliction of emotional distress, a plaintiff must

8   show "(1) extreme and outrageous conduct by [Defendant] with the intention of causing, or

9   reckless disregard of the probability of causing, emotional distress"; (2) that they "suffer[ed]

10  severe or extreme emotional distress; and (3) actual and proximate causation of the emotional

11  distress by [Defendant's] outrageous conduct."  *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009)

12  (citations and quotation marks omitted).  "It is not enough that the conduct be intentional and

13  outrageous.  It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of

14  whom the defendant is aware."  *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 903 (1991).  "A

15  defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually

16  tolerated in a civilized community."  *Hughes*, 46 Cal. 4th at 1051 (cleaned up).

17             Here, Lopez does not allege conduct by any ICE agent that was "directed at" Sanchez Brito

18  or that occurred in Sanchez Brito's presence of whom the agent was aware.  Lopez's opposition

19  focuses solely on ICE agents' alleged "extreme and outrageous conduct" and Sanchez Brito's

20  emotional distress.  *See* Opp'n 22-23.  As the complaint fails to state a claim for intentional

21  infliction of emotional distress, the court does not reach the argument that the claim is time-barred

22  as to acts or omissions prior to November 29, 2020.  The emotional distress claim is dismissed

23  with leave to amend.

24  **VI.    CONCLUSION**

25             For the foregoing reasons, GEO's motions to transfer and to dismiss are denied.  The

26  government's motion to dismiss is granted in part and denied in part, as follows: the false

27  imprisonment based on false arrest claim is dismissed as untimely with leave to amend.  The

28  failure-to-release negligence claim and intentional infliction of emotional distress claim are

United States District Court
Northern District of California

1   dismissed with leave to amend.  The conditions of confinement negligence claim is dismissed for

2   lack of subject matter jurisdiction without prejudice and without leave to amend.

3        The negligence claims based on California juvenile records laws and the circumstances of

4   Sanchez Brito's release from custody are dismissed without leave to amend.

5        Any amended complaint must be filed within 21 days of the date of this order.  The court

6   will hold an initial case management conference on **September 18, 2024** at 1:30 p.m. by Zoom

7   videoconference.  A joint case management statement is due by **September 11, 2024**.

8        **IT IS SO ORDERED.**

9   Dated: July 29, 2024



Donna M. Ryu
Chief Magistrate Judge
Judge Donna M. Ryu

United States District Court
Northern District of California