UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSA LOPEZ,<br><br>        Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>        Defendants. | Case No. 23-cv-04292-DMR<br><br>**ORDER DENYING UNITED STATES' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Re: Dkt. No. 53 |

The United States moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff Rosa Lopez's first amended complaint ("FAC"). [Docket No. 53.] This matter is suitable for determination without oral argument. Civil L.R. 7-1(b).[1] For the following reasons, the motion is denied.

## I.    BACKGROUND

### A.    Allegations in the FAC

Plaintiff Lopez is the legal guardian of V.S., a minor and successor in interest to the estate of Victor Sanchez Brito. Lopez filed this lawsuit against Defendants United States and GEO Group, Inc. ("GEO"), asserting claims under the Federal Tort Claims Act ("FTCA"), the Rehabilitation Act, and state law arising out of Sanchez Brito's 2015 arrest and detention.

Lopez makes the following allegations in the FAC, all of which are taken as true for purposes of the motion to dismiss.[2] Victor Sanchez Brito was born in California in 1990. Rosa Lopez is Sanchez Brito's mother and the court-appointed legal guardian of V.S., a minor and

---

[1] The court will conduct the November 12, 2024 initial case management conference as scheduled.

[2] When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted).

Sanchez Brito's son. [Docket No. 48 (FAC) ¶¶ 3, 13, 40.]

At the time of Sanchez Brito's birth, Lopez was in a violent and abusive relationship with his father, Victor Sanchez Carrillo. Lopez and Carrillo lived in a trailer on a ranch in Temecula, California, where they worked. Lopez gave birth to Sanchez Brito in the trailer in which she lived. She did not register Sanchez Brito's birth in the United States or obtain a birth certificate because Carrillo did not allow Lopez to leave the ranch for any reason. *Id*. at ¶¶ 39-41. Lopez eventually fled to the San Francisco Bay Area where her children joined her. *Id*. at ¶ 46.

Sanchez Brito began experiencing symptoms of mental illness when he was a teenager. He was eventually diagnosed with schizoaffective disorder—bipolar type and a cognitive disability stemming from a childhood traumatic brain injury. *Id*. at ¶¶ 3, 44, 45. He had various "run-ins with the law" as a teenager and as an adult. *Id*. at ¶¶ 45, 47, 50. On April 25, 2015, Sanchez Brito was scheduled to be released from the Marin County Jail after completing a criminal sentence. At the time, Immigration and Customs Enforcement ("ICE") Officer Marco Grasso was stationed at the Marin County Jail to identify incarcerated individuals who were potentially subject to removal from the United States. *Id*. at ¶ 51. Grasso had access to the jail's booking system, which listed Sanchez Brito as a U.S. citizen, but other entries identified Mexico as Sanchez Brito's birthplace. Grasso interviewed Sanchez Brito, who told him he had been born in California, but Grasso did not believe him. *Id*. at ¶ 52. Grasso obtained a delayed Mexican birth registration that he "assumed established Mr. Sanchez Brito was born in Mexico," but the registration "had significant and obvious defects on its face that undermined its reliability as proof of Mexican birth." *Id*. at ¶¶ 53-56. After performing a "perfunctory and inadequate investigation" into Sanchez Brito's place of birth, Grasso "decided ICE should arrest Mr. Sanchez Brito as a non-citizen and imprison him without bond for removal proceedings." ICE took Sanchez Brito into custody on the same day he was released from the Marin County Jail. *Id*. at ¶¶ 57-61.

Lopez alleges that in arresting Sanchez Brito, Grasso failed to follow ICE Directive 16001.1, which is ICE's written policy for the detention of individuals with claims to U.S. citizenship. That policy required "immediate and careful investigation and analysis" and consultation with ICE attorneys. *Id*. at ¶¶ 24-25, 62. Instead, ICE deemed Sanchez Brito subject

to the "so-called mandatory detention provisions of the [Immigration and Naturalization Act, "INA"], 8 U.S.C. § 1226(c)" based on his criminal history and Mexican citizenship. *Id.* at ¶ 64.[3]

On April 27, 2015, ICE transferred Sanchez Brito to the Yuba Jail, which contracted with ICE to imprison ICE detainees. ICE officers were responsible for supervising the Yuba Jail's ICE detention operations and compliance with ICE detention standards and contractual duties. Lopez alleges on information and belief that ICE had officers on-site at the Yuba Jail every day. *Id.* at ¶ 63. Medical staff at the Yuba Jail assessed Sanchez Brito shortly after his arrival and noted his schizophrenia diagnosis. Lopez alleges that one or more ICE Deportation Officers assigned to Sanchez Brito knew of his "serious mental illness" at all times while he was in custody, as did the officers' supervisors. On May 3, 2015, one or more ICE officers referred Sanchez Brito to a psychiatrist, who noted that Sanchez Brito had been receiving regular injections of Invega Sustenna to successfully manage his symptoms and ordered the treatment to continue. *Id.* at ¶¶ 65-66. On May 18, 2015, an ICE doctor "conducted a mental health review" of Sanchez Brito and noted that he "reported having had auditory hallucinations since he was eighteen years old" and that "his Invega Sustenna injections had always helped him feel stabilized, even while in custody." The ICE doctor "noted that his appearance, behavior, and thought processes were appropriate and that his attitude was respectful." *Id.* at ¶ 69. However, by the fall of 2015, staff began treating Sanchez Brito's mental illness with Seroquel and Risperdone because the Invega injections were not "covered" by ICE. Sanchez Brito repeatedly informed staff that Seroquel and Risperdone were not effective. *Id.* at ¶ 70.

Sanchez Brito's first immigration court hearing was in May 2015 at which he was represented by counsel. *Id.* at ¶ 68. He had another immigration hearing in June 2015 at which Lopez testified under oath that she gave birth to Sanchez Brito in California, that she never registered his birth, that she had never seen the delayed Mexican registration, and that a signature on the document purporting to be hers was not hers. *Id.* at ¶¶ 71. Lopez testified in court again in July 2015. Other immigration court hearings were held in 2015 and 2016 at which the court

---

[3] 8 U.S.C. § 1226(c) requires the Attorney General to detain noncitizens who have committed certain criminal offenses.

3

considered Sanchez Brito's citizenship. ICE continued to detain Sanchez Brito during the proceedings. *Id*. at ¶¶ 72-76. Lopez also alleges that in November 2015, ICE issued Directive 16011.2, a new policy regarding detention of individuals claiming U.S. citizenship which required that individuals in ICE custody "for whom there was at least 'some probative evidence' of U.S. citizenship must be immediately released." Nonetheless, she alleges, ICE continued to detain Sanchez Brito in violation of the new directive. *Id*. at ¶ 74; *see id*. at ¶¶ 27-30.

In January 2017, an immigration judge ordered Sanchez Brito removed. The Board of Immigration Appeal upheld the order of removal in July 2017 and Sanchez Brito timely petitioned for review to the Ninth Circuit. *Id*. at ¶ 77. In December 2017, the Ninth Circuit transferred Sanchez Brito's petition to the United States District Court for the Eastern District of California for de novo review of his citizenship claim based on "a genuine issue of material fact . . . as to petitioner's claim of United States citizenship." The matter was assigned to the Honorable Kimberly J. Mueller. *Id*. at ¶¶ 78, 109.

Lopez alleges that throughout his immigration proceedings, Sanchez Brito "was suffering greatly" and his mental health was deteriorating. He spent significant periods of time in solitary confinement with limited access to programming, yard time, and other benefits. *Id*. at ¶¶ 79, 80. His immigration attorney "expressed concern to the [immigration judge]" and in March 2016, the attorney "requested another hearing to re-determine his competency." *Id*. at ¶ 79. Sanchez Brito was hospitalized in April 2018 due to his deteriorating mental health. *Id*. at ¶ 85.

In July 2018, ICE transferred Sanchez Brito from the Yuba Jail to Mesa Verde, a detention facility that GEO operates pursuant to a contract with ICE. *Id*. at ¶ 86. Lopez alleges on information and belief that "ICE stationed officers on-site every day at Mesa Verde and these officers and others in the ICE San Francisco Field Office were responsible for the supervision and oversight of GEO's detention operations there, including ensuring GEO's compliance with ICE detention standards and contractual duties." *Id*. at ¶ 87. She further alleges that "[p]eople in the general population at Mesa Verde are subjected to harsh conditions by Defendant GEO and the ICE officers responsible for supervising GEO's operations at Mesa Verde" and that Sanchez Brito's mental health deteriorated further while at Mesa Verde. By September 2018, Defendants

had placed him in administrative segregation, the "RHU" (restricted housing unit), for an alleged "safety concern" and he "spent a substantial amount of the next three years in a cramped cell in administrative segregation." *Id*. at ¶¶ 89, 92. Lopez alleges that Sanchez Brito's confinement in the RHU was "with the knowledge and approval of his ICE deportation officers, their supervisors, and the Field Office Director for the ICE San Francisco Field Office." *Id*. at ¶ 92. Lopez alleges that "every time Defendants and their officers placed [Sanchez Brito] and kept him in segregation, it was because of his serious mental illness, which Defendants and their officers caused to deteriorate while he was in their custody." *Id*. She further alleges that for Sanchez Brito, "the few services and programming opportunities available to people in general population were not available to him while he was in the RHU," and while in administrative segregation, he would get no more than one to two hours per day of access to an outside area and access to the library for only one hour per week. *Id*. at ¶ 97.

Meanwhile, in the district court proceedings reviewing Sanchez Brito's citizenship claim, Judge Mueller denied the United States' motion for summary judgment in July 2020, finding that "a genuine question of material fact exists regarding plaintiff's ability to rebut the presumption of alienage through substantial credible evidence." *Id*. at ¶ 110 (citing *Brito v. Barr*, No. 2:18-CV-00097-KJM-DB, 2020 WL 4003824, at *8 (E.D. Cal. July 15, 2020)). Notwithstanding this development, Lopez alleges that "Defendants continued to imprison Mr. Sanchez Brito at Mesa Verde, in violation of Directive 16001.2." *Id*.

The court held a bench trial in February 2021 on Sanchez Brito's citizenship claim and heard testimony from Lopez, Grasso, and an expert on binational families from Mexico. On December 10, 2021, the court found that Sanchez Brito "has produced 'substantial credible evidence,' by a preponderance of the evidence, of his U.S. citizenship" and concluded that he "is a U.S. citizen." *Id*. at ¶¶ 111, 112 (citing *Sanchez v. Garland*, No. 2:18-CV-00097-KJM-DB, 2021 WL 5867473, at *9 (E.D. Cal. Dec. 10, 2021)).[4] ICE released Sanchez Brito from custody the

---

[4] Notably, Judge Mueller "also found that Officer Grasso's investigation of Mr. Sanchez Brito's birth was 'incomplete,' faulting him for not 'asking Ms. Lopez about Brito's birth,' for 'not considering the cultural context of the Mexican registration of the birth,' and for 'his unquestioning reliance on information in databases' that Mr. Sanchez Brito was born in Mexico

5

1   same day, after over six and a half years in ICE detention. *Id*. at ¶ 114.

2       Lopez alleges that Sanchez Brito's mental health continued to deteriorate following his

3   release. On May 11, 2022, Lopez was informed that Sanchez Brito's body had been found in an

4   abandoned building. He was later determined to have died by drug overdose. *Id*. at ¶¶ 115-119.

5       Lopez filed an administrative tort claim with ICE on November 29, 2022. ICE confirmed

6   receipt of the same on February 8, 2023. *Id*. at ¶¶ 16-17.

### B.     Procedural Background

Lopez filed the complaint on August 23, 2023, alleging three claims under the FTCA against the United States: 1) false imprisonment; 2) negligence; and 3) intentional infliction of emotional distress. She also alleged six claims under federal and state law against GEO, none of which are at issue in this motion. V.S. is Sanchez Brito's sole successor in interest under California Code of Civil Procedure section 377.30, and Lopez brings all claims on V.S.'s behalf in her capacity as his legal guardian. *See* FAC ¶¶ 13, 135, 145, 153, 161, 167, 178, 184, 188, 192, 198.

The United States moved pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the complaint. GEO moved pursuant to 28 U.S.C. § 1404(a) to transfer the case to the Eastern District of California and pursuant to Rule 12(b)(6) to dismiss the complaint. On July 29, 2024, the court granted in part and denied in part the government's motion to dismiss and denied GEO's motions to transfer and to dismiss. *Lopez v. United States*, No. 23-CV-04292-DMR, 2024 WL 3588013 (N.D. Cal. July 29, 2024) ("*Lopez*" or the "July 29, 2024 order").

In relevant part, the court construed claim one as a "false imprisonment claim based on Grasso's allegedly unlawful arrest of Sanchez Brito." *Id*. at *12. The court dismissed the false imprisonment claim as untimely with leave to amend. *Id*. at *19.

---

when they actually 'contain[ed] conflicting information' about his birth." FAC ¶ 113 (quoting *Sanchez*, 2021 WL 5867473, at *8, 9). "The court found that 'Officer Grasso also did not evaluate critically the information contained in the Mexican birth certificate, which was registered three months after Brito's undisputed birth date, with the delayed registration raising a potential red flag.'" *Id*. at ¶ 113 (quoting *Sanchez*, 2021 WL 5867473, at *9). The December 10, 2021 Order was subsequently amended on reconsideration. The amended opinion does not repeat the court's earlier findings about Grasso's investigation. *Id*. at ¶ 113 n.7 (citing *Sanchez v. Garland*, No. 2:18-CV-00097-KJM-DB, 2022 WL 4237801 (E.D. Cal. Sept. 14, 2022)).

1    The court found that claim two, negligence, is based on two theories: "1) that ICE agents breached their duty to release Sanchez Brito once they became aware of probative evidence of his U.S. citizenship (the 'failure-to-release theory'); and 2) that ICE agents breached their duty to protect Sanchez Brito "from harsh conditions of confinement known to cause substantial risk of serious harm, including prolonged solitary confinement" (the 'conditions of confinement theory')." *Id*. at *15. The court concluded that the complaint failed to state a negligence claim based on the failure-to-release theory and dismissed the claim with leave to amend. *Id*. at *19. The court held that the conditions of confinement negligence claim is barred by sovereign immunity and dismissed the claim without leave to amend. *Id*. at *18.[5]

The court held that the complaint failed to state a claim for intentional infliction of emotional distress and dismissed the claim with leave to amend. *Id*. at *20.

Lopez timely filed the FAC, which alleges the following claims under the FTCA against the government: 1) false imprisonment; 2) negligence (failure to release); and 3) intentional infliction of emotional distress ("IIED").[6] The United States now moves pursuant to Rule 12(b)(6) to dismiss these three claims.

## II.    LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). When reviewing a motion to dismiss for failure to state a claim, the court must "accept as true all of the factual allegations contained in the complaint," *Erickson*, 551 U.S. at 94, and may dismiss a claim "only where there is no cognizable legal theory" or there is an absence of "sufficient factual matter to state a facially plausible claim to relief." *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (quotation marks omitted) (quoting *Navarro v. Block*, 250

---

[5] Lopez moved for leave to file a motion for reconsideration of the dismissal without leave to amend of the conditions of confinement negligence claim, which the court denied on November 12, 2024. [*See* Docket Nos. 46, 63.]

[6] The FAC also includes a claim for negligence (conditions of confinement), presumably because at the time Lopez filed the FAC, the court had not yet ruled on the motion for leave to file a motion for reconsideration. The court has since denied that motion. The FAC also alleges six claims against GEO, which are not at issue in this motion.

7

F.3d 729, 732 (9th Cir. 2001)) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009)).  A claim has facial plausibility when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

Taken together, *Iqbal* and *Twombly* require well-pleaded facts, not legal conclusions, that "plausibly give rise to an entitlement to relief. *Whitaker v. Tesla Motors, Inc.*, 985 F.3d 1173, 1176 (9th Cir. 2021) (quotations and internal citations omitted).

A party may raise a statute of limitations defense on a motion to dismiss "[i]f the running of the statute is apparent on the face of the complaint." *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980).  Such a motion "can be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Id.*

## III.  DISCUSSION

### A.  Statute of Limitations

The United States moves to dismiss the false imprisonment claim as time-barred.  It also moves to dismiss the negligence and IIED claims as untimely to the extent they are based on acts or omissions that occurred before November 29, 2020.  Mot. 1, 4-5.

The FTCA requires plaintiffs to file an administrative claim within two years of when their claim accrues.  If they do not, their claim is time barred.  *Dyniewicz v. United States*, 742 F.2d 484, 485 (9th Cir. 1984) (citing 28 U.S.C. § 2401(b)).  28 U.S.C. § 2401(b) is "a nonjurisdictional claim-processing rule subject to the presumption in favor of equitable tolling." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1047 (9th Cir. 2013).  "The date on which an FTCA claim accrues is determined by federal law." *Bartleson v. United States*, 96 F.3d 1270, 1276 (9th Cir. 1996).  An FTCA claim "accrues when a plaintiff knows that he has been injured and who has inflicted the injury." *Winter v. United States*, 244 F.3d 1088, 1090 (9th Cir. 2001).

The court previously held that Lopez's false imprisonment claim, which is based on

Grasso's allegedly unlawful arrest of Sanchez Brito, accrued "when an immigration judge ordered Sanchez Brito removed, which was in January 2017." *Lopez*, 2024 WL 3588013, at *19. As Lopez filed an administrative tort claim on November 29, 2022, which was more than two years after the claim accrued, the claim is untimely.

Lopez argues that the statute of limitations should be equitably tolled. Opp'n 18. Equitable tolling exists "to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity." *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1052 (9th Cir. 2013) (internal quotation omitted). The party invoking "equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way." *Id.* (internal quotation omitted). The first element "requires the effort that a reasonable person might be expected to deliver under his or her particular circumstances. Central to the analysis is whether the plaintiff was without any fault in pursuing his claim." *Id.* (internal quotation omitted). The second element requires a litigant to show that "extraordinary circumstances," including "external circumstances beyond [the litigant's] direct control," caused the "untimeliness and . . . ma[de] it impossible to file [the document] on time." *Id.* (quotations omitted).

The Ninth Circuit has held that "mental incompetence" will toll a statute of limitations when it "precludes a person from asserting his rights during the proper time period." *Brockamp v. United States*, 67 F.3d 260, 263 (9th Cir. 1995), *rev'd on other grounds by United States v. Brockamp*, 519 U.S. 347 (1996). A plaintiff must establish that the "mental impairment was an 'extraordinary circumstance' beyond his control by demonstrating the impairment was so severe that either (a) plaintiff was unable rationally or factually to personally understand the need to timely file, or (b) plaintiff's mental state rendered him unable personally to prepare a complaint and effectuate its filing." *Johnson v. Lucent Techs. Inc.*, 653 F.3d 1000, 1010 (9th Cir. 2011) (quotation omitted). The plaintiff must also "show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances . . . ." *Id.* (quotation omitted).

9

The FAC contains the following allegations about Sanchez Brito's mental impairment: "Sanchez Brito suffered from significant and often debilitating mental illness, including several periods that required lengthy hospitalization," and that "[h]is mental illness was so severe that it prevented him from rationally or factually understanding the availability of relief under the FTCA or the need to file an administrative claim sooner than he did, and it rendered him unable personally to prepare and file an administrative claim under the FTCA sooner than he did." FAC ¶ 129. It includes detailed allegations about his condition, including that in February 2016, medical staff noted that he "had become dysphoric, confused, and 'grossly disorganized'" and that he "bit through his tongue" in April 2016, *id.* at ¶ 79; that medical staff "heavily medicated Mr. Sanchez Brito to the point of near-sedation," *id.* at ¶ 100; and that "[b]y late 2020, Mr. Sanchez Brito decompensated to the point that he could barely hold a conversation," "woke up from sleep unable to move," "was 'unable to communicate in complete sentences,'" and had attempted suicide. *Id.* at ¶ 105.

The FAC further alleges that "Defendants and their agents subjected him to prolonged incarceration in solitary confinement, which caused his disability to deteriorate further and which limited his ability to communicate with anyone outside of detention." *Id.* at ¶ 130. The FAC contains additional allegations about Sanchez Brito's limited ability and/or inability to communicate with individuals outside of detention, obtain evidence for his claim from ICE, or obtain information about administrative tort claims or the FTCA during his nearly seven years in detention. *Id.*

"[R]ead with the required liberality," *Jablon*, 614 F.2d at 682, and "construed in the light most favorable" to Lopez, *Johnson*, 653 F.3d at 1010, these allegations are sufficient to plead that Sanchez Brito's mental impairments, including schizoaffective disorder and a cognitive disability, constituted an "extraordinary circumstance" beyond his control that prohibited him from being able to "rationally or factually . . . personally understand the need to timely file" and "rendered him unable personally to prepare a complaint and effectuate its filing." *See id.* The United States notes that the FAC alleges Sanchez Brito's mental illness was "often debilitating" and included "several periods" of hospitalization, *see* FAC ¶ 129, and contends that these allegations show

10

United States District Court
Northern District of California

1    Sanchez Brito experienced some periods of debilitation, but that his illness "was not a continuous
2    impairment that prevented [him] from presenting his claim." Mot. 6. Ultimately, the
3    government's argument raises factual questions regarding the length and severity of Sanchez
4    Brito's periods of debilitation that are not appropriate for resolution on a motion to dismiss. *See*
5    *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995) ("[A] complaint
6    cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that
7    would establish the timeliness of the claim. For this reason, we have reversed dismissals where
8    the applicability of the equitable tolling doctrine depended upon factual questions not clearly
9    resolved in the pleadings."). Additionally, the United States points to the allegation that a doctor
10   noted in May 2015 that Sanchez Brito's "appearance, behavior, and thought processes were
11   appropriate," describing this as an admission that Sanchez Brito was not continuously impaired.
12   Mot. 6 (citing FAC ¶ 69). This purported admission is not dispositive, as the government ignores
13   that the observation allegedly took place when Sanchez Brito was still receiving Invega Sustenna,
14   which the FAC alleges "successfully manage[d]" his symptoms, and that by the fall of 2015,
15   medical staff began treating him with different medications that were not effective. *See* FAC ¶ 70.
16   Moreover, as previously stated, the false imprisonment claim did not accrue until 2017.
17         As to Sanchez Brito's diligence in pursuing the claims, the FAC alleges that he "at all
18   times pursued his rights diligently to the extent he could understand the process imposed on him,
19   fully engaging in the only process made available to him or that he was aware of for vindicating
20   his rights as a United States citizen: his removal proceedings and subsequent petition for review to
21   the Ninth Circuit." FAC ¶ 132. The government argues this is insufficient because the FAC
22   concedes that Sanchez Brito was "fully engag[ed]" in his removal proceedings and the subsequent
23   federal court proceedings regarding his citizenship, which occurred during the same time that he
24   was allegedly unable to present his FTCA claim. Mot. 6-7 (citing FAC ¶ 132). It cites two cases
25   in support: *West v. United States*, No. CV-13-00304-PHX-GMS, 2018 WL 1090610, at *4 (D.
26   Ariz. Feb. 28, 2018), and *Watson v. United States*, 865 F.3d 123, 133 (2d Cir. 2017), but both are
27   distinguishable. In *West*, the plaintiff asserted that equitable tolling applied where he "claim[ed]
28   that he was mentally incapacitated and committed to a mental health facility." 2018 WL 1090610,

11

at *3. In response to the government's motion to dismiss his FTCA claim as untimely, the plaintiff argued only that "he had mental health issues that resulted in commitment, and thus was incapacitated during this time." *Id*. (quotation marks omitted). The court declined to apply equitable tolling, reasoning that "his mental illness did not impair his ability to file a timely claim" because he "had the mental capacity to successfully petition for post-trial relief" in a related criminal matter. *Id*. Notably, the plaintiff had written his petition for relief himself. *See id*. at *3 ("Mr. West wrote and filed a petition for post-conviction relief in Arizona Superior Court.").

Similarly, in *Watson*, the district court applied equitable tolling to the plaintiff's FTCA claims based on several factors, including the plaintiff's depression. 865 F.3d at 132. The Second Circuit reversed, finding in relevant part that "[d]epression did not prevent [the plaintiff] from contesting his citizenship before the immigration judge, so it could not have prevented him from filing his administrative claim for damages." *Id*. at 133. However, the court emphasized that the plaintiff had "mounted a vigorous case in the immigration court in [an] effort to prevent deportation" as a pro se party. *Id*. at 132. Moreover, it did not discuss any details of the plaintiff's mental health condition. *See id*.

In contrast to *West* and *Watson*, there are no allegations that Sanchez Brito was able to represent himself at any point in the immigration proceedings or the citizenship proceedings in district court, and the FAC is replete with details about Sanchez Brito's mental impairments and the severity of their resulting symptoms. Ultimately, whether Sanchez Brito was sufficiently diligent in pursuing his claims "to the extent he could understand them" is a factual question that cannot be resolved at this stage. *See Johnson*, 653 F.3d at 1010. The motion to dismiss the false imprisonment claim in its entirety and to dismiss the negligence and IIED claims to the extent they are premised on acts or omissions that took place prior to November 29, 2020 is denied.[7]

### B. Negligence Claim

Lopez's remaining negligence claim is based on the theory "that ICE agents breached their

---

[7] The government did not address the accrual date of the negligence and IIED claims in its opening brief, although Lopez addressed this issue in her opposition. *See* Opp'n 22-25. As the court finds that the FAC adequately alleges that Lopez's claims are timely based on equitable tolling, it need not reach this issue at this time.

12

duty to release Sanchez Brito once they became aware of probative evidence of his U.S. citizenship (the 'failure-to-release theory')." *See Lopez*, 2024 WL 3588013, at *15.

"A plaintiff in a negligence suit must demonstrate 'a legal duty to use due care, a breach of such legal duty, and the breach as the proximate or legal cause of the resulting injury.'" *Vasilenko v. Grace Family Church*, 3 Cal. 5th 1077, 1083 (2017). The court previously held that California law "supports the proposition that law enforcement officers have 'a duty to investigate the validity of an incarceration after sufficient notice.'" *Lopez*, 2024 WL 3588013, at *17 (quoting *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1381 (9th Cir. 1998)). However, the court dismissed the negligence claim on the ground that the complaint did not "sufficiently specify the identity or role of any individual Defendant in the alleged wrongdoing," including alleging "specific facts showing how each particular doe defendant violated [Lopez's] rights." *Id*. at *19 (quotation and citation omitted).

The United States argues that the FAC again fails to state a negligence claim because it does not link "any individual government employee to any specific act." Mot. 7. It also argues the FAC "does not cognizably allege any facts that any Government employee breached a legal duty of care that he or she owed to Plaintiff that was the proximate cause of Plaintiff's claimed harm." *Id*. at 8. Specifically, the government contends that "Plaintiff alleges as a conclusion that some unidentified '[a]gents of the United States' owed him a general duty to ensure that the conditions of confinement did not amount to punishment, to protect him against prolonged confinement, and to protect him from harm," but that "these generalized conclusions do not plead facts setting forth duty, breach, causation, and injury" sufficient to state a claim. *Id*. (citing FAC ¶ 142[8]).

The FAC alleges that "[t]he ICE officers responsible for Mr. Sanchez Brito's detention . . . owed a duty of care to Mr. Sanchez Brito while he was in their custody and when considering taking him into custody" and owed him a "heightened duty of care" because he was their prisoner.

---

[8] This citation appears to be a typographical error, as paragraph 142 is an allegation related to the damages caused by Sanchez Brito's alleged false imprisonment. It is not part of the negligence claim.

13

FAC ¶ 147. It adds the following allegations about the specific ICE officers that allegedly breached their duty to Sanchez Brito:

> All individuals in ICE detention are assigned an officer within the ICE Enforcement and Removal Operations unit. This officer is often referred to as the individual's 'Deportation Officer.' The Deportation Officer is responsible for determining matters related to the custody of detained individuals assigned to them, including whether the individual should be released and whether a condition of confinement is unlawful or must be altered regarding individuals assigned to them. Every Deportation Officer has a Supervisory Deportation Officer. And each Supervisory Deportation Officer has a supervisor within the ICE regional field office. This chain of command continues up the chain until it reaches the ICE Field Office Director in the ICE regional field office.

FAC ¶ 20. It alleges that "[t]his case involves agents in the ICE San Francisco Field Office, several of whom were assigned to Mr. Sanchez Brito's case as his Deportation Officers, Supervisory Deportation Officers, or other officers in the chain of command of those officers." *Id*.

The FAC further alleges that the Deportation Officers assigned to Mr. Sanchez Brito, as well as their supervisors up the chain of command, were obligated to follow ICE directives, including Directive 16001.2, *id*. at ¶¶ 24, 27, and that the Deportation Officers and their supervisors "were or should have been aware of" the developments in the immigration and district court proceedings, including "some probative evidence" of his U.S. citizenship, but that they "decided to continue to keep Mr. Sanchez Brito imprisoned." *Id*. at ¶¶ 71-72, 75-76, 78, 110, 111. The FAC alleges that the ICE officers breached their duties to Sanchez Brito by "[f]ailing to adequately investigate his citizenship claim prior to taking custody of him and during his imprisonment in ICE custody" and "[f]ailing to release him when they had some probative evidence of his U.S. citizenship or as they became aware of additional evidence of his U.S. citizenship." *Id*. at ¶ 148.

The court concludes that the FAC adequately identifies particular ICE officers by role who were responsible for making custody determinations regarding Sanchez Brito. Moreover, it provides far more than "generalized conclusions" about how they breached their duties to Sanchez Brito, as it alleges that the ICE officers were or should have been aware of the developing body of probative evidence supporting Sanchez Brito's U.S. citizenship but repeatedly failed to investigate

further and release him, violating their "duty to investigate the validity of [his] incarceration after sufficient notice."

The government also appears to argue that the FAC does not plead facts supporting causation and injury, *see* Mot. 8, but does not flesh this argument out in any detail. In any event, the argument is meritless, as the FAC alleges that specific ICE officers, identified by role, caused Sanchez Brito's prolonged detention, which in turn caused deterioration of his mental and physical health: "Defendants' treatment of Mr. Sanchez Brito systematically wore him down and broke him, causing significant decompensation, several psychotic breaks, and permanent harm to his mental health. Defendants caused his physical well-being to suffer as well." FAC ¶ 115. The motion to dismiss the negligence claim is denied.

### C.  IIED Claim

To establish a claim for IIED, a plaintiff must show "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress"; (2) that they "suffer[ed] severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (citations and quotation marks omitted). "It is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 903 (1991). "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community.'" *Hughes*, 46 Cal. 4th at 1051 (cleaned up).

The court previously held that the complaint failed to state a claim for IIED because it did not allege "conduct by any ICE agent that was 'directed at' Sanchez Brito or that occurred in Sanchez Brito's presence of whom the agent was aware." *Lopez*, 2024 WL 3588013, at *20. The FAC remedies this deficiency. Lopez alleges that ICE officers were aware of the evidence of Sanchez Brito's U.S. citizenship and still made specific decisions to keep him in custody. FAC ¶¶ 71-72, 75-76, 78. They disregarded ICE directives which required agents to prepare memoranda and make affirmative decisions to keep claimed U.S. citizens like Sanchez Brito in custody. *Id*. at

¶¶ 28-29.  Detaining an individual who agents know has a lifelong claim to U.S. citizenship is sufficiently outrageous conduct for an IIED claim, because no civilized community would tolerate officers incarcerating someone for nearly seven years even though they have reason to believe they have no lawful authority to imprison that person.

Additionally, Lopez alleges that ICE agents made intentional decisions to keep her son in solitary confinement for prolonged periods.  Specifically, she alleges that GEO's prolonged solitary confinement of Sanchez Brito was done "with the knowledge and approval of his ICE deportation officers, their supervisors, and the Field Office Director for the ICE San Francisco Field Office," that their "review of his placement was required" by an ICE directive, and that they "had the authority to relieve those conditions and end his solitary confinement." *Id*. at ¶¶ 36-37, 102.  However, "they either did not conduct the required review, or, if they did, they made intentional decisions to continue to subject him to solitary confinement, knowing it was substantially likely to cause harm." *Id*. at ¶ 80. These decisions were necessarily directed at Sanchez Brito.  The intentional imposition of prolonged solitary confinement is sufficiently outrageous conduct that alone exceeds the bounds of what is tolerated in a civil society, which Lopez alleges "is widely known to be particularly devastating for people with significant mental illness."  *Id*. at ¶ 128.

The government does not argue that the FAC fails to adequately allege the second and third elements of the IIED claim.  Accordingly, the motion to dismiss the IIED claim is denied.

## IV. CONCLUSION

For the foregoing reasons, the United States's motion to dismiss is denied.

**IT IS SO ORDERED.**

Dated: November 12, 2024



Donna M. Ryu
Chief Magistrate Judge